[Cite as *State v. Gilbert*, 2012-Ohio-1165.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 08 MA 206 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| HATTIE GILBERT | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 08 CR 382 A

JUDGMENT:    Affirmed in Part.  Reversed in Part.
Remanded.

APPEARANCES:
For Plaintiff-Appellee:    Atty. Paul J. Gains
Mahoning County Prosecutor
Atty. Ralph M. Rivera
Assistant Prosecuting Attorney
21 West Boardman Street, 6th Floor
Youngstown, Ohio  44503

For Defendant-Appellant:    Atty. Timothy Young
Ohio Public Defender
Atty. Kristopher A. Haines
Assistant State Public Defender
250 East Broad Street, Suite 1400
Columbus, Ohio  43215

JUDGES:
Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

Dated:  March 20, 2012

WAITE, P.J.

{¶1} Appellant Hattie Gilbert appeals her convictions on complicity to attempted murder, complicity to felonious assault, complicity to aggravated robbery, and complicity to kidnapping, along with four corresponding gun specifications. She received a combined sentence of fifty years in prison. Appellant raises eight assignments of error in this appeal. The state has conceded that the trial court should have merged the gun specification sentences, and we correct this error herein. Appellant also argues that there were allied offenses that should have merged at sentencing. The analysis for appellate review of allied offenses was recently changed in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. Under the *Johnson* analysis, and based on the specific facts of this case, aggravated robbery and kidnapping are not allied offenses and the sentences should not have merged. Similarly, under the facts of this case, attempted murder and felonious assault are not allied offenses and the trial court properly imposed sentences for both crimes. Appellant raises an error regarding jury instructions, but Appellant did not object to the jury instructions and the caselaw cited in support is not relevant to the issue raised. Appellant argues that there was insufficient evidence of complicity to robbery, but the record does not support the argument. Her Fourth Amendment arguments likewise are not persuasive. She raises a Sixth Amendment Confrontation Clause issue regarding a hearsay statement attributed to her codefendant Taran Helms, but any error is harmless in light of the otherwise overwhelming evidence of her guilt. She further argues that there should have been a change of venue due to pretrial publicity, but the record does not show jury bias as

a result of the alleged publicity or that the publicity was excessive. The record also supports the imposition of maximum consecutive sentences, and does not establish ineffective assistance of counsel.

{¶2} All of Appellant's arguments, except those related to her first assignment of error, are overruled. The sentences for the firearm specifications are hereby merged. Appellant's convictions and the remaining aspects of her sentence are hereby affirmed.

## Facts and Procedural History

{¶3} On April 3, 2008, Taran Helms and Hattie Gilbert were indicted by a Mahoning County Grand Jury on counts of attempted murder, felonious assault, aggravated robbery, and kidnapping, as well as four accompanying firearm specifications. The charges arose from a series of events that occurred on March 24, 2008, wherein the victim, Joseph Kaluza, was robbed and shot while on the way to make a bank deposit for his employer, a Kentucky Fried Chicken restaurant. As he headed for the bank, a blue-gray Saturn vehicle pulled up and suddenly stopped in front of him, causing an accident with Kaluza's vehicle. Kaluza called his district manager to report the accident, then called the police. Immediately following the accident, a man came up from behind Kaluza's vehicle and shot Kaluza in the neck. The man took the deposit money, pushed Kaluza's car to a more secluded spot, and threatened to shoot Kaluza again. The man then fled on foot. Police investigations eventually led to the arrests of Appellant and Helms.

**{¶4}** Appellant filed a motion to suppress on August 8, 2008. She sought to suppress statements she made to the police at her home prior to her arrest. The motion was denied on August 28, 2008.

**{¶5}** Co-defendant Helms filed a motion for change of venue on September 3, 2008, arguing that extensive pretrial publicity about the case necessitated a change of venue. Helms attached approximately 35 articles from newspaper and internet sources, ranging from lengthy detailed articles to single-line references, regarding the robbery, the investigation and legal proceedings, and the medical recovery of the victim. Helms later supplemented his motion for change of venue, attaching a DVD of television news coverage of the incident. Appellant joined Helm's motion on September 15, 2008. The motion was denied on September 15, 2008.

**{¶6}** The joint trial for Helms and Appellant commenced on September 15, 2008. Joseph Kaluza testified that he was a manager for a Kentucky Fried Chicken restaurant. One of his duties was to take the restaurant's deposits to the bank. While he was driving to the bank on March 24, 2008, a car decelerated suddenly in front of Kaluza, causing him to hit the rear of her vehicle. Appellant was the driver of that vehicle. Kaluza immediately called the police and the area manager for his restaurant. Appellant got out of her car and asked to use Kaluza's cellular phone. She used the phone and returned it to Kaluza. She then returned to her car. Shortly thereafter, codefendant Taran Helms appeared at the driver's side of Kaluza's car and shot Kaluza in the neck, instantly paralyzing him. Helms walked to Gilbert's car, motioned for her to leave, then returned to Kaluza's car and pushed it off of the main road and onto a side street in front of an abandoned house. Helms then looked in

the car for the deposit bag, and once he had found the bag containing $300.00, he said to Kaluza: "Where's the rest of the money, or I'm gonna shoot you in the head." (Tr., p. 1569.) Kaluza testified that, at that point, a man in a truck stopped and asked if Kaluza and Helms needed help, and Helms declined the offer of assistance. Helms then hurriedly grabbed another bag in the car (which turned out to be trash) and ran off.

{¶7} Kaluza further testified that Kimberly Helms, the defendant's mother, used to work at Kaluza's restaurant and knew the deposit procedure, but she was fired the prior spring for theft.

{¶8} Kandace Johnson testified that she lived in a house a short distance away from where the incident occurred. Johnson stated that she saw the car accident occur, and saw Appellant exit her car, speak to Kaluza, and return to her car. Johnson testified that Appellant was wearing a pink coat. Johnson saw Helms walk from Ravenwood Street onto South Avenue, the main street where the accident occurred. Helms walked up to Kaluza's car, fired a shot into the car without breaking his stride, and continued to Gilbert's car. Helms and Appellant spoke together for a minute. Johnson then saw Helms point for Appellant to leave, which she did. Johnson saw Helms immediately return to Kaluza's car and start "fumbling around," by reaching into the car through the driver's side window. (Tr., p. 1611.) Johnson saw Helms push the car, turn the car off, fumble around a bit more, then pull the car off of South Avenue and onto a side street, Hilton. Johnson estimated that 90 seconds elapsed between the gunshot and moving the car. Johnson saw Helms

continue to look around in Kaluza's car on the front passenger's side. Johnson saw Helms run through a yard as tow-trucks arrived at the scene.

{¶9} Jeremy Vignon, a passerby, testified that he saw Kaluza in his car shortly after the accident had occurred. As he drove by, Vignon noticed that Kaluza was slumped over and bleeding. Vignon decided to turn around and go back to the scene as Helms was finishing pushing the car onto Hilton. Vignon asked Helms if he needed any help, and Helms responded that he only had a flat tire. Vignon drove off again, but noticed that the car did not have a flat tire, and called the police. Vignon circled around again, and when he returned to the scene, Helms was running through the yard and tow trucks were arriving.

{¶10} David White, a tow truck driver for Ludt's Towing, arrived on the scene as Helms was rummaging through Kaluza's vehicle. He and Mr. Vignon both observed Helms get out of Kaluza's vehicle and run through a backyard heading north, carrying an object in his hand.

{¶11} Law enforcement officers testified regarding their investigation of the incident. Police arrived on the scene shortly after the accident and realized that a potential homicide had taken place. Officer Justin Coulter and a K-9 unit were called to the scene to search the area. Coulter started the search near the spot where Kaluza's vehicle had come to rest. The dog immediately began to track a scent. His tracking first led to a firearm. Next, the dog led Officer Coulter around a fence to a black and orange jacket laying on the ground. The dog followed the scent to a footprint behind a garage, but lost the track soon after that.

{¶12} A Western Reserve Transit Authority ("WRTA") bus video captured the accident, showing a 2001/2002 blue-gray Saturn L series vehicle. Police generated a list of owners of similar vehicles, which later led to a police interview at Appellant's residence because her car matched the car in the video. Police discovered a damaged Saturn vehicle at Appellant's home similar to the car in the video. Detective Lieutenant Milstead testified that he asked Appellant if she knew why he was there, and she answered "Yeah. It's probably that crash I got into on South Avenue." (Tr., p. 1741.) Appellant admitted she wore a pink coat at the time and retrieved it for the detective. She was placed under arrest and taken to the Youngstown Police Department. She was read her *Miranda* rights and waived them in writing. She soon confessed to planning the robbery of Kaluza. She had watched Kaluza for several weeks, even to the point of following him to the bank to learn the route he would take. She admitted to purchasing the bullets for a firearm two weeks before the robbery.

{¶13} Detective Sergeant John Kelty testified that he interviewed Appellant and later interviewed Helms, after Helms's wallet was found in her car and after Helms's mother's prior employment at the Kentucky Fried Chicken had been discovered. Appellant admitted she staged the accident so that the robbery could take place. She watched from her rearview mirror as Kaluza was shot. She heard the gun go off, and saw Kaluza's head slump forward. After speaking with Helms, she drove away.

{¶14} Various items of physical and scientific evidence were admitted during trial, including a video of the accident captured by a WRTA bus; a spent shell casing

from the crime scene; a gun, coat, cap, and mask from the crime scene; the Bureau of Crime Investigation's lab results, which found Helms's DNA on the gun, coat and mask; and items retrieved from Appellant's car, including a box of bullets and Helms's wallet.

{¶15} Neither Helms nor Gilbert presented a defense. The jury was charged on September 18, 2008, and on the same day it returned a verdict of guilty against both defendants. The jury convicted Appellant Gilbert on four counts of complicity corresponding to the four counts in the indictment: complicity to attempted murder, R.C. 2923.02(A) and 2903.02, a first degree felony; complicity to felonious assault, R.C. 2903.11(A)(2), a second degree felony; complicity to aggravated robbery, R.C. 2911.01(A)(1), a first degree felony; and complicity to kidnapping, R.C. 2905.01(A)(2), a first degree felony. The first degree felonies carried possible ten-year prison terms, and the second degree felony could be punished by an eight-year prison term. The jury also convicted Appellant on the four corresponding firearm specifications, each carrying a possible three-year prison term.

{¶16} A sentencing hearing was held on September 23, 2008, and a sentencing judgment entry was filed the same day. The court imposed the maximum prison terms on each count. Appellant received ten years in prison for count one, eight years for count two, ten years for count three and ten years for count four, along with three years in prison for each of the four firearm specifications. The sentences were ordered to be served consecutively, for a total of fifty years in prison. The court filed a corrected nunc pro tunc sentencing entry on September 26, 2008. This appeal followed.

ASSIGNMENT OF ERROR NO. 1

**{¶17}** "The trial court committed reversible error when it sentenced Ms. Gilbert to multiple sentences for allied offenses of similar import committed with a single animus, and failed to merge the firearm specifications regarding all counts in the indictment, in violation of R.C. 2941,25, and in violation of Ms. Gilbert's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. (Sept. 26, 2008, Sentencing Entry; Sept. 23, 2008, Sentencing Memorandum)."

**{¶18}** In this assignment of error Appellant challenges three aspects of sentencing. First, Appellant contends that her sentences for complicity to aggravated robbery and kidnapping should have merged because they are allied offenses under the new standard established in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061. Second, Appellant contends that her sentences for complicity to attempted murder and complicity to felonious assault should also have merged as allied offenses under *Johnson*. Third, Appellant argues that the sentences for the four firearm specifications should have merged. The state has already conceded that the firearm specifications should have merged. The only remaining issue is whether Appellant was convicted and sentenced for allied offenses.

**{¶19}** We first examine whether complicity to attempted murder and complicity to felonious assault are allied offenses. The question as to whether crimes are allied offenses arises from the Double Jeopardy Clause of the Fifth Amendment, which protects individuals from multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). The Ohio

Legislature has codified this protection in R.C. 2941.25. Under the statute, a defendant may not be punished for multiple offenses if the defendant's actions constitute allied offenses of similar import. *Id.* at syllabus.

**{¶20}** In *State v. Johnson*, supra, the Ohio Supreme Court overruled *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), to the extent that *Rance* called for a comparison of multiple offenses "solely in the abstract." *Johnson* at ¶44. *Rance* had attempted to create an objective standard for determining allied offenses based on comparing the statutory elements of the crimes rather than looking at the conduct of the accused. The *Rance* formula, though, sometimes led to absurd results and became unworkable. *Johnson* returned a subjective element to the review of allied offenses: "the statute instructs courts to examine a defendant's conduct—an inherently subjective determination." *Johnson* at ¶52. Pursuant to the plurality opinion in *Johnson*:

**{¶21}** "If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.' *Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶50 (Lanzinger, J., dissenting).

**{¶22}** "If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

**{¶23}** "Conversely, if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge." *Id.* at ¶49-51. (Emphasis sic.)

**{¶24}** It is clear that the conduct of the accused must now be considered when determining whether multiple offenses were allied offenses. *Id.* at syllabus. Thus, the test applied in *Johnson* is: 1) can the two offenses be committed by the same conduct; and if so, 2) looking at the facts of the case, were the two offenses committed by the same conduct as a single act with a single state of mind. *Id.* If the answer to both questions is yes, then they are allied offenses of similar import and must be merged. If the acts were committed separately or with a separate animus, they are not allied offenses. *Id.* at ¶51.

**{¶25}** *Johnson* recognized that, due to the subjective nature of the analysis based on the facts of each case, some crimes may be allied offenses in certain cases, but not in another case under different facts. *Id.* at ¶52.

**{¶26}** The *Johnson* plurality holding has been followed in eleven of the twelve appellate districts. *State v. McClendon*, 2d Dist. No. 23558, 2011-Ohio-5067; *State v. Taylor*, 3d Dist. No. 12-10-49, 2011-Ohio-5080; *State v. Humphrey*, 4th Dist. No. 10CA3150, 2011-Ohio-5238; *State v. Hight*, 5th Dist. No. 2011CA0056, 2011-Ohio-5013; *State v. Nickel*, 6th Dist. No. OT-10-004, 2011-Ohio-1550; *State v. Stoffer*, 7th Dist. No. 09-CO-1, 2011-Ohio-5133; *State. Adkins*, 8th Dist. No. 95279, 2011-Ohio-5149; *State v. McDaniel*, 9th Dist. No. 25492, 2011-Ohio-5001; *State v. Mason*, 10th Dist. Nos. 10AP-337, 10AP-342, 2011-Ohio-3301; *State v. May*, 11th Dist. No. 2010-L-131, 2011-Ohio-5233; *State v. Crosby*, 12th Dist. Nos. CA2010–10–081, CA2011–02–013, 2011-Ohio-4907. The First District seems to follow a different standard based on the general notion that a trial court must simply look at the facts of the case

to see if the state relied on the same conduct to prove two offenses. *State v. Strong*, 1st Dist. Nos. C-100484, C-100486, 2011-Ohio-4947.

**{¶27}** We now turn to the first set of alleged allied offenses: complicity to attempted murder and complicity to felonious assault. To establish the elements of attempted murder, the state must prove that the defendant engaged in conduct that, if successful, would have resulted in purposely causing the death of another. R.C. 2903.02(A); R.C. 2923.02(A). To establish the elements of felonious assault, the state must prove that the defendant knowingly caused or attempted to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). To establish complicity by aiding and abetting under R.C. 2923.03(A), "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus.

**{¶28}** The first question is whether attempted murder and felonious assault can be committed with the same conduct. The answer is yes. The conduct of pointing and shooting a gun at a person or persons can result in the death of one or more individuals, and the same conduct can also fall short of causing death but can cause physical harm. Since the answer to the first question is yes, the second question is whether the two offenses were in fact committed with the same conduct, i.e., was there was a single act committed with a single state of mind? *Johnson*,

supra, at ¶49. The answer to this question depends in large measure on a review of all of the facts of this case.

{¶29} The facts supporting attempted murder are as follows: Helms walked up from behind Kaluza's car with a loaded gun intending to rob the victim, pointed the gun at the vicinity of Kaluza's head from very close range, and fired the gun, hitting the victim's neck and paralyzing him. The facts supporting felonious assault are more complicated. As the dissent pointed out in *State v. Helms*, 7th Dist. No. 08 MA 199, 2010-Ohio-4872 ("*Helms I*"), there are two sets of circumstances in the record in which Helms used or threatened to use a gun against Kaluza. The facts surrounding the attempted murder could be used to describe a felonious assault. Helms walked up to Kaluza's car with a deadly weapon and fired the weapon, causing serious physical harm. If we rely on only these facts to support both charges, there is no question the two offenses are allied. This record contains two scenarios involving a gun threat, though. The record also reveals a second, separate, incident establishing that after Helms shot Kaluza, he pushed Kaluza's car to a more secluded location, rummaged through the car looking for more money, then threatened to shoot Kaluza in the head. There is evidence showing that Helms continued to possess the gun that he used a few minutes earlier, and Helms' intent to use the weapon again is certainly established in this record because Kaluza had already been shot by Helms.

{¶30} Turning to the second set of facts as evidence of felonious assault, this scenario also presents us with a separate crime having a separate animus that is distinct from the other charges brought against Appellant. "There is no statutory or constitutional prohibition against imposing separate punishments for allied offenses

or lesser included offenses if they are committed independently or with a separate animus." *State v. Hooper*, 7th Dist. No. 03 CO 30, 2005-Ohio-7084, ¶19.

**{¶31}** Various cases have upheld the principle that threatening to use a firearm, coupled with the act of pointing or waving a firearm at someone, satisfies the elements of felonious assault. *See, e.g., State v. Green*, 58 Ohio St.3d 239, 569 N.E.2d 1038 (1991); *State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (1990); *State v. Brooks*, 44 Ohio St.3d 185, 542 N.E.2d 636 (1989); *State v. Ellington*, 2d Dist. No. 23828, 2010-Ohio-5280; *State v. Jackson*, 8th Dist. No. 93815, 2010-Ohio-4486. "Pointing a firearm, coupled with a threat indicating an intention to use the weapon, is sufficient to establish felonious assault. The defendant's intent to cause physical harm may be inferred from his actions under the circumstances." (Citations omitted.) *State v. Alexander*, 11th Dist. Nos. C-100593, C-100594, 2011-Ohio-4911, ¶5. In all of these cases, the determinative factor is whether the "defendant's actions were strongly corroborative of his intent to cause physical harm * * * by means of his deadly weapon." *Green*, supra, at 242.

**{¶32}** In the instant case, we have even more conclusive facts to rely on than those involved in *Green* and its progeny. Regarding the threat element, the record shows that Helms specifically stated he was going to shoot Kaluza in the head. After Helms made this threat, he was interrupted by a passerby, Jeremy Vignon, who asked if everyone was okay or needed help. While Helms fled almost immediately after speaking with Vignon, there is no doubt that Helms' threat was serious because he had already fired the gun at Kaluza, hitting him in the neck. Helms had not hesitated to use the gun earlier. He walked up behind Kaluza's car and fired at him

without warning. Because Kaluza was unable to turn his head and actually see Helms when he made the verbal threat, we do not have direct evidence that the gun was pointed at Mr. Kaluza contemporaneously with the threat. But we have much more reliable evidence of the defendant's willingness and ability to shoot; Helms actually shot the victim shortly before threatening to do it again. Mr. Vignon interrupted the course of this crime, but the gun was retrieved near the (second) crime scene with a live round in the chamber. (Tr., p. 2024.) The gun was undeniably functional as it had already been used a few minutes earlier. The gun was also test fired by the BCI during the investigation of the case and was found to be operational. (Tr., p. 2058.) Compared to the facts in *Green*, the facts of the instant case are much more corroborative of the defendant's intent and ability to cause physical harm to Kaluza by means of a deadly weapon.

{¶33} The main difference between the facts of *Green* and related cases versus the instant case is that the prior cases rely on evidence that the gun was physically pointed at the intended victim to establish intent, whereas here, we rely on the actual use of the weapon to establish intent. In this case, Kaluza had already been shot and paralyzed when Helms made his threat, so there is no testimony that he saw Helms pointing the gun at him. The evidence of the gun being pointed at the victim, though, is cited in the body of caselaw that follows *Green* as part of the corroborative evidence to establish the defendant's intent to use the weapon. It is not that the weapon was pointed that is determinative in these types of cases, and in fact, that fact alone is not sufficient of itself to establish felonious assault: "The act of pointing a deadly weapon at another, without additional evidence regarding the

actor's intention, is insufficient evidence to convict a defendant of the offense of 'felonious assault' as defined by R.C. 2903.11(A)(2)." *State v. Brooks*, 44 Ohio St.3d 185, 542 N.E.2d 636, (1989), syllabus. On the other hand, if pointing a weapon combined with a general threat is sufficient to establish the necessary intent to commit felonious assault, then it is even more persuasive to prove felonious assault by showing that the defendant actually used the weapon to seriously injure the victim, and then threatened to do it again a mere few minutes later.

{¶34} The dissent in *State v. Helms*, 7th Dist. No. 08 MA 199, 2012-Ohio-1147, contends that the facts of this case amount only to aggravated menacing, but this theory was rejected in *Green*: "Defendant suggests that the only conviction that the evidence could support in this case is aggravated menacing, in violation of R.C. 2903.21(A), * * *. We disagree, because the defendant, in making his threat along with his actions, took a substantial step in a course of conduct apparently planned to culminate in the commission of a crime." *Id.* at 242, fn.2. In *Green*, the threat and the action taken by the defendant were that of pointing a loaded and functioning rifle at a policeman's head, coupled with these threatening words: "If you don't have a warrant get the fuck out of my house." *Id.* at 239. The threat and action in this case consist of the actual use of the firearm resulting in a gunshot wound to the neck; a brief period of time intervening; then a threat to shoot the victim in the head along with substantial proof that the gun was loaded, operable, and was hastily discarded near the crime scene when the shooter fled. Once again, the facts in this case appear stronger than those in *Green*, and in *Green* the conviction for felonious assault was upheld.

**{¶35}** This dissent appears to concede that there would be sufficient evidence of felonious assault if the state had provided any evidence of what Helms' was doing with the gun at the time he made the threat. Given that circumstantial evidence is as valid as direct testimonial evidence in proving any element of a crime, the record contains more than sufficient, competent and credible circumstantial evidence that Helms had the ability and intent to carry out his threat to shoot Kaluza in the head. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991).

**{¶36}** The *Helms* dissent also contends that there is a due process problem in relying on the evidence of Helms' threat to kill Kaluza as proof of felonious assault because that set of facts does not correspond to the prosecutor's theory of the case set forth in the opening and closing arguments. The issue in a review of allied offenses, though, does not involve due process, but whether double jeopardy occurred in sentencing a person twice based on the same set of facts. Whether or not the prosecutor's theory of the case as articulated in its opening and closing remarks corresponds to the actual evidence presented is not under review when examining the record for allied offenses. Obviously, opening and closing statements are not evidence. "It is well settled that statements made by counsel in opening statements and closing arguments are not evidence." *State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). In reviewing a sentence for allied offenses, we normally look at the entire record and review the entire set of facts and circumstances as presented to the trier of fact. We do not exclude particular properly admitted facts from our consideration simply because we believe the jury was paying more attention to the prosecutor's opening and closing remarks rather than the actual

presentation of the evidence. The jury is free to match the facts presented at trial to the elements of the crime as stated in the indictment. The indictment here does not specify any facts regarding felonious assault except that Kaluza was the victim and that it occurred on March 24, 2008. The bill of particulars does not provide any further explanation about the details of felonious assault. There was no objection filed regarding the felonious assault charge in the indictment or the bill of particulars. There was no objection made to Kaluza's testimony regarding Helms' threat to shoot him in the head. There was no clarification requested in the jury instructions about felonious assault. We find nothing in the record that would limit our normal procedure of viewing the entire record as part of the consideration in determining whether there were allied offenses. Based on the record, Appellant committed a felonious assault that is not an offense allied to any other crime in this case. Thus, the trial court properly imposed a separate sentence for that crime.

{¶37} Turning now to the counts regarding complicity to aggravated robbery and kidnapping, a similar analysis must be conducted. Aggravated robbery pursuant to R.C. 2911.01(A)(1) is defined as:

{¶38} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

{¶39} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]"

{¶40} Kidnapping is defined in R.C. 2905.01(A)(2) as:

{¶41} "(A)   No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

{¶42} "* * *

{¶43} "(2)  To facilitate the commission of any felony or flight thereafter[.]"

{¶44} Once again, first we must question whether these two crimes can be committed by the same conduct.  The answer is yes.  A robbery of a person, by its very nature, involves, to some degree, holding that person by force to commit a crime.  Hence, it constitutes a type of kidnapping.  It has been longstanding law in Ohio, both before and after *Rance*, that the two crimes may be allied offenses.  *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979).

{¶45} The second question is whether the offenses were committed with the same conduct, i.e., was there was a single act committed with a single state of mind?  The answer here is no.

{¶46} The state established that the movement of Kaluza in his vehicle after he was shot was prolonged, secretive and independent of the other offenses.  The kidnapping took place during the few minutes after Kaluza was shot.  After the shooting, when Kaluza was paralyzed, Helms went over to talk to Appellant for a period of time.  When he returned to Kaluza's car, he briefly searched it, then pushed the victim's car onto a side street, where he searched for the deposit bag.  One witness testified that it took 90 seconds for Helms to push the car down the street.  Various witnesses established that Helms left Kaluza in the car, paralyzed, and pushed the car with Kaluza in it to a more secluded area.  Any restraint or asportation

of a victim may constitute a separate offense of kidnapping if it was not necessary in order to complete the robbery offense. *State v. Gore*, 131 Ohio App.3d 197, 127, 129-130, 722 N.E.2d 125 (1999). The robbery took place when Helms searched the car for the deposit bag. The kidnapping took place when Helms left a helpless Kaluza to talk to Appellant, then moved the car to a more secluded street. These are two distinct factual events, and both of them can result in a criminal conviction and sentence.

**{¶47}** In addition, there also appears to be a separate animus for both crimes, and separate animus is another basis for finding that the crimes are not allied offenses subject to merger. "Animus refers to the defendant's immediate criminal motive, intent or state of mind." *Hooper*, supra, ¶15, citing *State v. Blankenship*, 38 Ohio St.3d 116, 119, 526 N.E.2d 816 (1988). When a kidnapping is committed during another crime, there exists no separate animus "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime." *Logan*, supra, at syllabus. However, "where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," there is a separate animus as to each offense. *Id.* Separate animus also exists if the restraint or movement of the victim substantially increases the risk of harm to the victim. *Id.* In this case, the movement of Kaluza was prolonged, secretive, substantial, and increased the risk of harm to the victim. Therefore, the record contains evidence of separate animus and the two crimes are not allied offenses subject to merger.

**{¶48}** Appellant's first assignment of error has partial merit, in that the state has conceded error with respect to the gun specifications. Those four specifications are merged and only one three-year prison term will be imposed. The remaining aspects of the assignment of error are overruled.

## ASSIGNMENT OF ERROR NO. 2

**{¶49}** "The trial court committed plain error when it failed to provide the jury with an augmented instruction regarding its duty to unanimously find Ms. Gilbert guilty of the offenses alleged in the indictment based on a particular set of facts for each alleged crime, in violation of Ms. Gilbert's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Tr. 2279-2320)."

**{¶50}** Appellant argues that it was plain error for the trial court to fail to provide a special instruction to the jury that it must unanimously agree to one particular set of facts that constituted each offense in the indictment. Appellant contends that the state presented two different versions of what may constitute an attempted murder. Appellant submits that the initial shot to Kaluza's neck could have been an attempted murder, and that the act of moving Kaluza to a more secluded location could also have constituted an attempted murder. Appellant believes the trial judge should have given an instruction that the jurors were required to agree on one set of facts that resulted in the conviction for attempted murder. Appellant did not object to the jury instructions and acknowledges that only plain error may be raised at this point.

{¶51} Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. Crim.R. 52(B). The doctrine of plain error requires that there must be: (1) a deviation from a legal rule; (2) that is obvious, and; (3) that affects the appellant's substantial rights. *State v. Hardges*, 9th Dist. No. 24175, 2008-Ohio-5567, ¶9. Plain error is not present unless, but for the error complained of, the outcome of the trial would have been different. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶52} Appellant cites only one case in support, that of *United States v. Gipson* (C.A.5, 1977), 553 F.2d 453. Appellant cites this case as if it were a Sixth Circuit case, which would represent persuasive (but not binding) precedent in this Court, but the case is actually out of the Fifth Circuit. In *Gipson*, the defendant was convicted under a federal statute that prohibited a person from receiving, concealing, storing, bartering, selling, or disposing of a stolen vehicle or aircraft, known to be stolen, that had moved in interstate commerce. In response to a question from the jury, the trial judge instructed the jurors that they need not agree on which of the acts enumerated in the statute the defendant had violated as long as each juror found that he had committed one of the acts. The jury convicted him and Gipson appealed, arguing that his right to a unanimous verdict had been violated. The Fifth Circuit Court of Appeals concluded that the judge's instruction violated the defendant's right to have the jury decide unanimously which course of action the defendant had pursued. The court held that the trial judge's instruction improperly permitted the jury to convict on a single count without choosing between "two distinct conceptual groupings." One

grouping involved the "housing" of stolen goods (by receiving, concealing, and storing the goods) and the other grouping involved the "marketing" of the stolen goods (by bartering, selling, and disposing of them). *Id.*, 553 F.2d at 458-459.

**{¶53}** Both the United States Supreme Court and the Fifth Circuit, itself, have questioned the validity of *Gipson.* See *Schad v. Arizona*, 501 U.S. 624, 635, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); *United States v. Bolts*, 558 F.2d 316 (C.A.5, 1977) (the Fifth Circuit limited its *Gipson* holding to cases in which the judge specifically and expressly permitted a nonunanimous verdict in its jury instructions). No other court follows the *Gipson* holding. This appeal does not involve a challenge to a jury instruction that specifically permitted a nonunanimous verdict, but rather, raises an argument that the facts of the case gave rise to the necessity of further jury instructions. Appellant has no other support for her argument, and, as *Gipson* does not support Appellant's argument, either, this assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

**{¶54}** "The trial court violated Ms. Gilbert's rights to due process and a fair trial when, in the absence of sufficient evidence, the trial court convicted Ms. Gilbert of complicity to attempted murder with firearm specification, and complicity to felonious assault with firearm specification, in violation of Ms. Gilbert's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Sept. 26, 2008, Sentencing Entry; Tr. 1558-59, 1604-17, 1666-67, 1828-33, 2179-83, 2189-90, 2221)."

**{¶55}** Although Appellant's counsel at trial conceded her guilt on the charge of complicity to robbery, counsel raised Crim.R. 29 motions for acquittal on the other

charges based, in part, on the theory that she did not know that Helms would shoot Kaluza. Appellant challenges the sufficiency of the evidence as to her mens rea for kidnapping, felonious assault and attempted murder.

**{¶56}** Sufficiency is a term of art meaning that legal standard which is applied to determine whether a case may go to the jury or whether evidence is legally sufficient to support the jury verdict as a matter of law. Sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955). A conviction based on legally insufficient evidence constitutes a denial of due process. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

**{¶57}** Where there is substantial evidence on which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988). The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Therefore, an appellate court must view the evidence in a light most favorable to the prosecution, and determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 547 N.E.2d 492 (1991); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶58}** The complicity statute states that: "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following: * *

* (2) Aid or abet another in committing the offense." R.C. 2923.03(A). The person committing complicity must share the criminal intent of the principal. *State v. Moore*, 7th Dist. No. 02 CA 152, 2004-Ohio-2320. An aider and abettor is not simply someone who associates with the principal. *State v. Prichard*, 1st Dist. No. C-941011 (Feb. 7, 1996). The aider and abettor must have "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, supra, syllabus. The mens rea element of the crime can be inferred from all the facts and circumstances of the case, and even from the criminal act itself. *Id.* at 245; *see also*, *State v. Cartellone*, 3 Ohio App.3d 145, 148, 444 N.E.2d 68 (1981).

{¶59} "The law is well settled that when two or more people engage in a course of criminal conduct and one does one part and the other another, each is responsible for the acts of the other as though he had personally performed each of the acts." *State v. Wynn*, 131 Ohio App.3d 725, 729, 723 N.E.2d 627 (1998), citing *State v. Chapman*, 21 Ohio St.3d 41, 487 N.E.2d 566 (1986).

{¶60} The facts of this case reveal that the crime was coordinated so that Appellant would cause Kaluza to have an auto accident, after which Helms would then rob him at gunpoint. It can certainly be inferred that Appellant knew a gun or some other deadly weapon would be involved in the crime in order to induce Kaluza into turning over his restaurant deposit. She purchased .380 caliber ammunition prior to the robbery. The receipt for the purchase of the bullets was entered into evidence. The bullets were found in her car after the robbery. Whether or not Appellant specifically knew the gun would actually be fired is not a defense, because she is

responsible for whatever Helms did with the gun once it became part of the crime. "The mere act of driving away from the scene of a shooting perpetrated by a passenger of a vehicle has been held to be sufficient to uphold a conviction based on complicity where the circumstances show the driver knew shots were being fired by the passenger." *State v. Garner*, 10th Dist. No. 07AP-474, 2008-Ohio-944, ¶21. By law, Appellant is treated as if she herself shot Kaluza, and the act of firing the shot directly at Kaluza through a car window in order to facilitate the robbery is evidence enough to infer criminal intent to commit attempted murder. This assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 4

**{¶61}** "The trial court committed reversible error when it admitted Ms. Gilbert's statements into evidence against her at trial, in violation of Ms. Gilbert's Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Aug. 8, 2008, Motion to Suppress; Aug. 22, 2008, Suppression Hearing Tr.; Aug. 28, 2008, Judgment Entry; Miranda Waiver, Aug. 22, 2008, Suppression Hearing Tr., Ex. 1; Hattie Gilbert Interview DVD, Aug. 22, 2008, Suppression Hearing Tr., Ex. 2; Tr. 1731-45, 1828-33)."

**{¶62}** Here, Appellant contends that the trial court should have suppressed statements she made to the Youngstown police at her home and further statements she made after she was arrested. Thus, she is challenging the ruling on her motion to suppress.

{¶63} When reviewing a motion to suppress, an appellate court must determine whether the trial court's findings are supported by competent, credible evidence. *State v. Lloyd*, 126 Ohio App.3d 95, 100, 709 N.E.2d 913 (1998). "In a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 548, 679 N.E.2d 321 (1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (1994). A reviewing court must accept the trial court's factual findings and the trial court's assessment of witness credibility, but must independently determine as a matter of law whether the trial court met the applicable legal standard. *State v. Sharpe*, 7th Dist. No. 99CA510 (June 30, 2000).

{¶64} Appellant's first issue is with the statements she made while in her home. Detective Mark Milstead was conducting a search for automobiles similar to the one used in the crime, and he visited Appellant's residence as part of his inquiry. He asked her four questions while at her home: if she knew why he had come to talk to her; if she had worn a pink coat at the time of the accident; if she still had the coat; and if she would give the coat to him. She admitted that she was involved in a car accident with Kaluza. She admitted she had the coat, and she retrieved the coat for Milstead. Appellant states that she was not given *Miranda* warnings prior to this questioning. There does not seem to be any dispute about this point. Appellant argues that Milstead knew he was going to arrest her when he asked her the questions. Appellant implies that asking questions in her residence with the possible

intent to arrest based on the answers to these questions is the equivalent to actual custodial interrogation.

**{¶65}** In *Miranda v. Arizona*, the United States Supreme Court developed procedural safeguards to protect an individual's Fifth Amendment right against self-incrimination during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A suspect must be in custody and subject to interrogation before police are required to give *Miranda* warnings. *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995). A person is in custody for purposes of a *Miranda* analysis when there has been a formal arrest or when a person's movement is so restrained that a reasonable person would believe that he or she is under arrest. *State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2000); *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). A court must look at the totality of the circumstances in order to determine whether an individual is in custody at any given time. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

**{¶66}** This Court has used a ten factor test to help decide whether a suspect is in custody for purposes of a *Miranda* analysis:

**{¶67}** "1) What was the location where the questioning took place--i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;

**{¶68}** "2) Was the defendant a suspect at the time the interview began (bearing in mind that Miranda warnings are not required simply because the investigation has focused);

**{¶69}** "3) Was the defendant's freedom to leave restricted in any way;

**{¶70}** "4) Was the defendant handcuffed or told he was under arrest;

**{¶71}** "5) Were threats made during the interrogation;

**{¶72}** "6) Was the defendant physically intimidated during the interrogation;

**{¶73}** "7) Did the police verbally dominate the interrogation;

**{¶74}** "8) What was the defendant's purpose for being at the place where questioning took place? For example, the defendant might be at a hospital for treatment instead of being brought to the location for questioning;

**{¶75}** "9) Were neutral parties present at any point during the questioning;

**{¶76}** "10) Did police take any action to overpower, trick, or coerce the defendant into making a statement." *State v. Tate*, 7th Dist. No. 07 MA 130, 2008-Ohio-3245, ¶46-66.

**{¶77}** In this case, Appellant was in her own home, she was a suspect in the case, her freedom of movement was not restricted, she was not handcuffed or told she was under arrest, there were no threats made, there was no physical or verbal intimidation, Appellant was not at her house simply to be questioned by the police, Appellant's daughter was present during the questioning, and Appellant was not tricked or coerced into making a statement. Other than the fact that she was a suspect while the questioning took place, the overwhelming totality of the circumstances indicates that she was not in custody.

**{¶78}** As to the statements she gave to police at the station, the record reflects that Appellant did not raise any challenges to those statements in her motion to suppress. The record also shows that she was read her *Miranda* rights and that she waived those rights in writing prior to making the statements. (Trial Tr., p. 1828; State's Exh. 1.) She agreed to any questions from the police. She stated that an unknown person asked her to participate in the crime to run someone off the road so that a robbery could be committed. (Trial Tr., p. 1828.) She subsequently changed her story to admit that she was part of a plan to rob Kaluza of his daily deposit. (Trial Tr., p. 1829.) She said she watched Kaluza for weeks, examining the details of his daily routine in making bank deposits. She admitted that she planned to obtain a gun and that she purchased bullets. (Trial Tr., pp. 1829-1830.)

**{¶79}** Appellant now raises something she said in her videotaped confession that she believes triggered her *Miranda* rights even after she signed a waiver of those rights. She argues that she said "I don't want to talk about this," and that this statement was a re-invocation of her right to remain silent. There is no transcription of this confession, but a DVD of the interview is attached to the transcript of the August 22, 2008, motion to suppress hearing. The recording is dated March 28, 2008, and at 10:55:57 in the recording she interrupts a fabricated story she is telling about some unknown person calling her on her cell phone and says very softly "I don't want to talk about this." It is not clear from the DVD whether she is repeating something from the imaginary phone call or whether this is a statement directed to the police officer in the room. A voice is then heard to say, "Hattie, the only thing that is going to save you from years of prison is you being honest." Appellant then

continued with her statement. Appellant contends that the police should have recognized that she was refusing to answer any more questions, and that they ignored her right to remain silent when they failed to cut off further questioning.

**{¶80}** Appellant has waived all but plain error because she did not raise this constitutional issue in a motion to suppress. *State v. Roskovich*, 7th Dist. No. 04 BE 37, 2005-Ohio-2719, ¶13, citing *State v. Peagler*, 76 Ohio St.3d 496, 500, 668 N.E.2d 489 (1996). Crim.R. 12(C)(3) requires a defendant to file a motion to suppress in order to challenge any statements that were obtained illegally. A motion to suppress is the proper vehicle for raising challenges based on violations of the Fourth, Fifth and Sixth Amendments. *State v. French*, 72 Ohio St. 3d 446, 449, 650 N.E.2d 887 (1995). By failing to file a motion to suppress challenging the statements made at the police station, Appellant has deprived the state from having the opportunity to respond and present rebuttal evidence to the alleged error.

**{¶81}** Even though the alleged error has been waived, the state does attempt to explain what happened at the interview in which Appellant confessed to her involvement in the crime. The record contains a signed waiver of her *Miranda* rights prior to Appellant's interview. The error raised for the first time on appeal is that Appellant attempted to cut off questioning while she was being interviewed, but that the police continued to question her. The state accurately responds that any invocation of the right to remain silent must be done unambiguously. *State v. Murphy*, 91 Ohio St.3d 516 (2001), citing *Michigan v. Mosely*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). The defendant cannot invoke the right to remain silent by simply being silent. *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250,

176 L.Ed.2d 1098 (2010). Further, if the accused makes an ambiguous statement regarding the right to cut off questioning, the police are not required to end the interrogation or ask clarifying questions about the statement. *Id.*, 130 S.Ct at 2260. In *Murphy*, the defendant's statement that "I'm ready to quit talking and I'm ready to go home, too" was not deemed to be an unambiguous or unequivocal invocation of the right to cut off questioning. (Emphasis omitted.) *Murphy* at 520-521.

{¶82} Similarly, Appellant's statement is ambiguous. It is not clear if she is making a statement at all because she is relating a story (that she admits is completely false a few seconds later) about a phone call with an alleged co-conspirator. Also, it is not clear what "this" refers to when she says "I don't want to talk about this." If she is referring to the fabricated story about the phone call, the police did heed her request and did not continue asking her about the phone call. The First District Court of Appeals recently held that the statement "that's all I can let you know right there as far as yesterday" was ambiguous and did not invoke the right to cut off questioning. *State v. Strong*, 1st Dist. Nos. C-100484, C-100486, 2011-Ohio-4947, ¶48. The Eleventh District Court of Appeals held that the statements "[y]ou got what you wanted. Okay?" and "I'm done" did not unambiguously invoke the right to stop questioning. *State v. Griffith*, 11th Dist. No. 2001-T-0136, 2003-Ohio-6980, ¶32-35. Based on these examples, and on the context of the statement made by Appellant, the record does not indicate a clear, unequivocal, unambiguous invocation of her right to end police questioning.

{¶83} Appellant's fourth assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 5

{¶84} "Ms. Gilbert was denied her right to confront the evidence against her at trial, in violation of her Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Tr. 1936-37, 1945-53)."

{¶85} Appellant argues that the witness Ashlinn Sykes related a statement made by codefendant Helms implicating Appellant in the crimes. Appellant is now raising for the first time a Sixth Amendment claim that she was denied the right to confront the witnesses against her. Appellant failed to object to this testimony at trial. Therefore, it is reviewed only for plain error.

{¶86} The testimony in question is as follows:

{¶87} "Q. Did he at some point describe where he was going after breakfast?

{¶88} "A. No. He said he had to go get Hattie, and there was some things that they had to do. That was it." (Trial Tr., p. 1952.)

{¶89} The Sixth Amendment to the United States Constitution guarantees that a criminal defendant shall have the right to confront the witnesses against him. The admission into evidence of a confession of a codefendant who is not testifying at trial is inadmissible under the Sixth Amendment. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). "In *Bruton*, the Supreme Court held that in a joint trial of two defendants, a confession of one co-defendant who did not testify could not be admitted into evidence even with a limiting instruction that the confession could only be used against the confessing defendant. The rationale of *Bruton* was that the introduction of a potentially unreliable confession of one

defendant which implicates another defendant without being subject to cross-examination deprives the latter defendant of his right to confrontation guaranteed by the Sixth Amendment." *State v. Moritz*, 63 Ohio St.2d 150, 153, 407 N.E.2d 1268 (1980). However, *Bruton* errors are reviewed under a harmless error analysis: "Our conclusion that appellant was implicated in these two instances contrary to his right of confrontation does not, however, mean that his conviction is to be automatically reversed. The line of cases following *Bruton* have firmly established that an error of this sort may be harmless." *Id.* at 155-156.

**{¶90}** Appellant's own attorney admitted in his opening statement to the jury that she was involved in the robbery, that she planned the robbery, and that she was guilty of robbery. (Trial Tr., p. 1558.) Her confessions to the police also confirmed her involvement in the crimes. The physical evidence established her connection to the crimes, including the box of bullets she purchased and Helms' wallet which were found in her car, and the pink coat she wore which was identified by witness Johnson. She admitted to staking out Kaluza at his restaurant to learn his banking habits. She admitted she caused the car accident with Kaluza. It is difficult to see how Ms. Sykes' testimony added anything material to the overwhelming evidence establishing Appellant's involvement in the crime. This assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 6

**{¶91}** "The trial court abused its discretion and denied Ms. Gilbert her right to a fair trial by an impartial jury when it overruled her motion for a change of venue, in violation of Ms. Gilbert's rights under the Fifth, Sixth, and Fourteenth Amendments to

the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Sept. 11, 2008, Motion to Join Motion to Change Venue; Sept. 15, 2008 Judgment Entry; Sept. 17, 2009, Verdict Forms; Tr. 40-1167, 1265-67, 1276-77, 1407-12, 1420-22, 1434-36, 1438-41, 1460)."

**{¶92}** Appellant argues that the court should have granted the joint motion for change of venue due to extensive prejudicial pretrial publicity. She argues that the extensive pretrial publicity of the case made the selection of an impartial jury impossible. A motion for change of venue is governed by Crim.R. 18(B), which provides that "the court may transfer an action * * * when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." A trial court has broad discretion in its ruling on a motion for change of venue. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶60. A reviewing court must therefore uphold the trial court's decision on the motion absent a clear showing of an abuse of discretion. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶38. An abuse of discretion connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Adams*, 62 Ohio St.2d 151, 157-158, 16 O.O.3d 169, 404 N.E.2d 144 (1980).

**{¶93}** Appellant argues that the pretrial publicity in this case is similar to that which occurred in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In *Sheppard*, there was extensive pretrial publicity about the defendant's refusal to take a lie detector test, and the stories included details about the investigation and opinions as to why the defendant was guilty, the defendant's affair with another woman and ensuing theories about the defendant's murder motive.

During the trial, the trial court allowed representatives of the media to dominate the seating area of the courtroom, allowed the media to photograph the jury on a daily basis, and did little to regulate their conduct. *Id.* at 343-345, 358-359. Although the Supreme Court noted that trial court's failure to take precautions against the jury's exposure to enormous pretrial publicity was not enough alone to constitute a due process failure, they found that the trial court's subsequent acquiescence to the media's dominance of the courtroom and its subversion of the entire trial process required the reversal of Sheppard's habeas denial. *Id.* at 355-356, 363.

**{¶94}** Appellant's motion for change of venue included approximately 35 articles from newspaper and internet sources regarding the case, ranging from lengthy detailed articles to single-line references. Earlier articles detail the occurrence of the crime, the investigation, and the arrest and bond hearings of both Helms and Appellant, and discussion that a motion to suppress was filed and its outcome. Almost all of the later articles discuss the community support for the victim and fundraising for his medical bills. A supplement to the motion for change of venue included a DVD of television news coverage of the accident from a WRTA bus security camera. It is not clear if this DVD contained material that was broadcast or made available to the general public. Appellant asserts that this extensive pre-trial media coverage of the case prevented her ability to secure a fair trial.

**{¶95}** The media coverage in this case is not equivalent to that which occurred in *Sheppard.* The mere existence of pretrial publicity is not a basis for granting a change of venue. *State v. Roberts,* 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶117. By itself, even pervasive adverse pretrial publicity "does not

inevitably lead to an unfair trial." *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶58. The Ohio Supreme Court has held that a "careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶61, quoting *State v. Landrum*, 53 Ohio St.3d 107, 117, 559 N.E.2d 710 (1990).

**{¶96}** In order to successfully claim that pretrial publicity has denied a defendant of a fair trial, he must show that one or more jurors were actually biased. *Yarbrough* at ¶61. Only in rare cases may prejudice be presumed. *State v. Lundgren*, 73 Ohio St.3d 474, 479, 653 N.E.2d 304 (1995).

**{¶97}** The record shows that the voir dire on pretrial publicity for this case was comprehensive, and constitutes almost two thirds of the 2333-page trial transcript. First, the trial court asked the prospective jurors whether any of them knew about the case through firsthand information, interactions within the community, or media coverage. Only five of the twelve impaneled jurors fell within this group, and the remaining seven who were eventually impaneled stated that they had no knowledge of the case. The trial court then conducted an extensive sequestered individual voir dire of all prospective jurors who had indicated any familiarity with the case. The prospective jurors were asked about the extent of their knowledge of the case, and asked whether they could set aside what they had heard and decide the case solely on the evidence presented at trial. Counsel was able to question and disqualify prospective jurors regarding their exposure to pretrial publicity. Following this

questioning, the trial court excused a number of potential jurors who had formed fixed opinions due to pretrial publicity or were otherwise unsuitable.

{¶98} Of the five impaneled jurors who indicated some prior knowledge of the case, none knew or recognized the names of the defendants. They could not name the victim, but four recognized his name when it was told to them. All five heard that the victim worked for or was a manager of a KFC restaurant, and that the victim had been critically injured. Some of the jurors had heard that there was a robbery and an attempted murder by shooting. One juror had heard that a car crash and weapon were used. All five of these jurors stated that they had not formed any opinion as to the guilt or innocence of the defendants, and could be fair and impartial to both sides. They all stated that they could set aside any information about the case that they had previously been exposed to, and would only take into consideration the evidence presented at trial. Appellant's counsel passed on all five of these jurors for cause.

{¶99} Appellant argues that there was racial bias in the jury. Appellant points out that there was a discovery during voir dire that someone had written a racial epithet on the men's bathroom wall in the courthouse. There was nothing in the record indicating that any of the impaneled jurors wrote or even observed the graffiti in the men's restroom. Appellant has not provided any evidence from the record to imply that any one of the jurors who was in fact impaneled was "actually biased" as required by *Yarbrough*.

{¶100} If the defense does not challenge any of the impaneled jurors for cause due to pretrial publicity, the absence of challenges indicates that the defense "was not particularly troubled by the jury's exposure to pretrial publicity." *McKnight*,

supra, at ¶63, citing *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶52. Defense counsel made repeated arguments regarding the prejudicial effect of pretrial publicity during the individual voir dire on the specific subject of publicity. Yet, counsel made no such argument for the five jurors that were eventually selected, and passed on excluding those jurors when given the opportunity to object based on bias from knowledge of the case. This undermines any presumptions of bias based on these five jurors' prior knowledge of the case.

**{¶101}** The media's presence in this case was not so pervasive as to per se deny Appellant a fair trial, and the comprehensive voir dire process resulted in no example of bias on the part of any juror who was actually impaneled. Appellant's sixth assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NO. 7</u>

**{¶102}** "The trial court abused its discretion when it sentenced Ms. Gilbert to maximum, consecutive terms of imprisonment on all counts in the indictment, in violation of Ohio Revised Code Sections 2929.11 and 2929.12, and in violation of Ms. Gilbert's rights under the Fourteenth Amendment to the United States Constitution, and Section 16, Article I of the Ohio Constitution. (Sept. 26, 2008, Sentencing Entry; Sentencing Entry Tr. 10-11, 14)."

**{¶103}** In this assignment of error, Appellant argues that the trial court abused its discretion in imposing maximum consecutive sentences. Appellate courts review felony sentences using a two-fold analysis. "First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to

law.  If this first prong is satisfied, the trial court's decision shall be reviewed under an abuse-of-discretion standard."  *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, ¶4 (O'Connor, J., plurality opinion), citing *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

**{¶104}** A sentencing court must consider the principles and purposes of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12.  *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, ¶38.  The sentencing court need not make findings regarding these statutes.  We have held that a silent record raises the rebuttable presumption that the sentencing court considered the statutory sentencing criteria.  *State v. James*, 7th Dist. No.07CO47, 2009-Ohio-4392, ¶50.  Only if the record affirmatively shows that the trial court failed to consider the principles and purposes of sentencing will a sentence be reversed on this basis, unless the sentence is strikingly inconsistent with relevant considerations.  *Id.*

**{¶105}** Appellant does not argue that the sentence is contrary to law, but only that it constitutes an abuse of discretion.  An abuse of discretion means more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.  *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).  Thus, in the felony sentencing context, "[a]n abuse of discretion can be found if the sentencing court unreasonably or arbitrarily weighs the factors in R.C. 2929.11 and R.C. 2929.12."  *State v. Heverly*, 7th Dist. No. 09 CO 4, 2010-Ohio-1005, ¶34.  Although a trial court was formerly required to engage in detailed judicial factfinding in order to justify imposing maximum or consecutive sentences, this is no longer the case.  *Foster*, supra, paragraph seven of the syllabus.  The decision to impose

maximum or consecutive sentences is simply part of the trial court's overall discretion in issuing a felony sentence and is no longer tied to mandatory factfinding provisions.

**{¶106}** Appellant claims that she played only a limited role in the crime and that she did not know that Helms would actually use the gun. She also states that she had no prior criminal record, had not been previously adjudicated a juvenile delinquent, had no history of drug or alcohol abuse, and showed genuine remorse for her actions. She contends that she in unlikely to reoffend. She believes that these factors should have resulted in less than maximum consecutive sentences.

**{¶107}** The record reveals that Appellant was extensively involved in the planning of this crime. She observed Kaluza for many weeks to determine how and when to commit the crime. She purchased the bullets for the gun. Helms' wallet with his driver's license and his cell phone were found in her car. She caused the accident that allowed Helms to approach Kaluza and shoot him. She knew the purpose of her causing an accident was to commit an armed robbery. She saw Kaluza get shot. She stayed at the crime scene to talk to Helms while Kaluza sat, bleeding and paralyzed, in his car. This was a cold, calculated crime involving a firearm that was made possible in large part by Appellant's actions. The court was within its discretion to treat both Helms and Appellant as equally guilty and equally deserving of punishment in this case. (9/23/08 Tr., p. 12.) The trial judge did not believe that Appellant had any genuine remorse. (9/23/08 Tr., p. 14.) It is true that some of the seriousness factors in R.C. 2929.12 do weigh in Appellant's favor, including her lack of a prior criminal record. The existence of one or more mitigating factors, though, does not preclude the court from imposing maximum consecutive

sentences. The seriousness and recidivism factors are for the court's consideration, but ultimately, the court retains the discretion to impose a sentence that it believes is most appropriate. Based on the factors cited by the trial court, and on the record of this case, there was no abuse of discretion in imposing maximum consecutive sentences. This assignment of error is overruled.

ASSIGNMENT OF ERROR NO. 8

**{¶108}** "Defense counsel rendered ineffective assistance of counsel in violation of Ms. Gilbert's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution. (Hattie Gilbert Interview DVD, Aug. 22, 2008 Suppression Hearing Tr., Ex. 2; Tr. 1828-33, 1947-53, 1976)."

**{¶109}** Appellant contends that her trial counsel was ineffective for failing to challenge the confession she made to the police on March 28, 2008. During the interview she stated "I don't want to talk about this." Appellant argues that this statement was enough to cut off further questioning, and that her attorney should have tried to exclude the remainder of the confession on that basis. The error is raised in this appeal, but it is raised as plain error rather than preserved error. Appellant also argues that her counsel should have objected to the testimony of Ashlinn Sykes. Ms. Sykes testified regarding a statement made by Helms that inculpated Appellant. This error was also raised on appeal as plain error.

**{¶110}** We review a claim of ineffective assistance of counsel under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, it must be shown that counsel's performance has fallen

below an objective standard of reasonable representation. Second, the defendant must establish that prejudice arose from the lawyer's deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). To show prejudice, a defendant must prove that, but for his lawyer's errors, a reasonable probability exists that the result of the proceedings would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Prejudice may not be assumed but must be affirmatively shown. *See State v. McGee*, 7th Dist. No. 07MA137, 2009-Ohio-6397, ¶13.

{¶111} When considering an ineffective assistance of counsel claim, the reviewing court should not consider what, in hindsight, may have been a more appropriate course of defense. *See State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Our review of counsel's action is highly deferential as there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

{¶112} Trial counsel's failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). However, the failure to file a motion to suppress may constitute ineffective assistance of counsel when the record demonstrates that the motion would have been granted. *State v. Barnett*, 7th Dist. No. 06-JE-23, 2008-Ohio-1546, ¶31.

{¶113} Appellant cannot demonstrate that a motion to suppress the confession at the police station would have been granted. As earlier discussed, it is not at all clear that Appellant's statement was an attempt to cut off questioning, and

she certainly did not assert her right to cut off questioning in an unambiguous and unequivocal manner, as required by *State v. Murphy* and *Michigan v. Mosely*, supra. She also showed no hesitation in continuing with the questioning after she made the statement. Further, the confession was only one part of a wide array of evidence against Appellant. She herself had told the police at her home that she was involved in a car accident with the victim, and she produced the pink coat she wore that had been identified by witnesses and in a WRTA video. Her car was also indentified in the video. The type of bullets used in the crime were found in her car, along with Helms' wallet and driver's license. The receipt that was generated when she purchased the bullets was also introduced as evidence. The confession did add details as to the extent of her involvement in planning the crime, but it was by no means the only evidence against her. It is not apparent that the outcome of the case would have been different had the confession been excluded.

{¶114} Regarding the failure to object to Ms. Sykes' testimony, once again Appellant cannot show any prejudice. At most, the statement of Ms. Sykes (in which she repeated a statement from Helms that "he had to go get Hattie, and there was some things that they had to do") showed that Appellant knew Helms and may have had a connection to the crime. Many other aspects of the evidence established these two points as well and did it more effectively. Her own attorney conceded in his opening statement that Appellant was guilty of robbery: "The evidence will show that Hattie Gilbert planned the robbery." (Trial Tr., p. 1558.) She herself told the police that she was at the crime scene. Ms. Sykes did not add any material evidence to the case when she related the statement made by Helms. Without a showing of

prejudice, a defendant cannot prove ineffective assistance of counsel, and prejudice means that the outcome of the case would have been different. The outcome of this case would not have been different had counsel objected to Ms. Sykes' statement. This assignment of error is overruled.

## Conclusions

{¶115} The only reversible error in this case is the error that has been conceded by the state. The state agrees that the firearm specifications should have merged, and we hereby remand to the trial court to correct the sentence accordingly. We overrule the remaining assignments of error. Appellant has not shown that there were allied offenses that should have been merged. She did not establish any error in the jury instructions. The evidence establishes her complicity with all aspects of the crime, including the use of the gun. There is no reversible error with respect to statements she made to the police both before and after arrest. A statement made by witness Sykes should likely have been stricken on Sixth Amendment grounds, but there was no prejudice caused by the statement. Appellant did not establish error in the court's decision to overrule a motion to change venue. The maximum consecutive sentences were within the discretion of the trial court. Finally, Appellant did not prove ineffective assistance of trial counsel.

{¶116} The judgment of the trial court as to Appellant's convictions and sentences for complicity to attempted murder, complicity to felonious assault, complicity to aggravated robbery, complicity to kidnapping, are affirmed. The judgment of the trial court regarding the imposition of four consecutive prison terms for four firearm specifications is reversed. The case is remanded to the trial court to

correct the sentence so that the four firearm specifications are merged and only one three-year prison term is imposed for the firearm specifications.

Donofrio, J., concurs.

Vukovich, J., concurs.