[Cite as *State v. Williams*, 2012-Ohio-5344.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 10 MA 136 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| ANTHONY D. WILLIAMS | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:          Criminal Appeal from the Court of
                                                          Common Pleas of Mahoning County,
                                                          Ohio
                                                          Case No. 10 CR 475

JUDGMENT:          Affirmed in part. Sentence Vacated.
                              Remanded for Resentencing.

APPEARANCES:

For Plaintiff-Appellee:          Atty. Paul J. Gains
                                              Mahoning County Prosecutor
                                              Atty. Ralph M. Rivera
                                              Assistant Prosecuting Attorney
                                              21 West Boardman Street, 6th Floor
                                              Youngstown, Ohio  44503

For Defendant-Appellant:          Atty. Rhys B. Cartwright-Jones
                                              42 N. Phelps Street
                                              Youngstown, Ohio  44503-1130

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

                                              Dated:  November 14, 2012

[Cite as *State v. Williams*, 2012-Ohio-5344.]
WAITE, P.J.

## Summary

{¶1} On April 26, 2010, Appellant Anthony D. Williams was being held in the Mahoning County Justice Center when the sprinkler head in his cell was broken. At the time of the damage, Appellant was alone in the cell. As a result of the breakage, seventy-two cells and the adjacent common areas were without fire protection, disrupting law enforcement and emergency services for the duration of the clean up and repair of the breakage. Appellant was charged with and convicted of vandalizing government property and disrupting government services as a result of the damage to the sprinkler head and system. Appellant argues that he received ineffective assistance of counsel at trial, that his convictions were against the weight of the evidence, and that he was convicted of allied offenses which should merge for sentencing purposes. While Appellant's first and second assignments of error are without merit and are overruled, the record is inconclusive with regard to Appellant's third assignment of error. Thus, we vacate Appellant's sentence and remand the matter for a hearing on the issue of possible merger and for resentencing.

## Facts

{¶2} On April 26, 2010, Appellant, Anthony D. Williams, was being held at the Mahoning County Justice Center. Appellant, who had previously served a federal prison term, appears to have been awaiting a federal hearing or sentencing due to a gun violation which also violated the terms of his release. On the day of the incident Appellant, who was anticipating a meeting with his attorney, had a verbal altercation with a corrections officer. This resulted in Appellant's removal from the general

population areas of the jail and his introduction into O-Pod. O-pod is a disciplinary section of the jail where those being held are placed in individual cells and prevented from interacting with one another and with the rest of the jail population.

{¶3} According to the testimony of Deputy Hyshaw, who was in charge of O-pod on April 26, 2010, Appellant was taken to cell 28 in O-pod while in restraints. Once Appellant was placed in his cell and the transporting deputy believed he was calm, his restraints were removed, and he was left alone in the cell. After Appellant's restraints were removed he began shouting, and punching and kicking the door. At this point Deputy Hyshaw was observing the O-pod from the booth. Shortly after the punching and kicking began, the fire alarm went off and water began pouring from under the door of the cell Appellant occupied. (Tr. Vol. II, pp. 183, 191.) Maintenance was called. The water spread throughout O-pod, into the deputy booth, and down to the pod below.

{¶4} The source of the water was the jail sprinkler system. Water gushed into the cell because the sprinkler head had been broken away from the wall. Two pieces of the head were later retrieved from the cell. One smaller piece was found to be completely detached from the wall. The second, larger portion of the head had to be removed for repair. (Tr. Vol. II, p. 187.) All testifying jail employees, both deputies and maintenance, testified that they had never known a head to break spontaneously, but that inmates did periodically break them off of the wall. It is unclear exactly how Appellant may have broken the sprinkler head in this instance; other inmates had used sheets to pull them off or hit them with a shoe. Appellant had a blanket in the cell with him, was clothed, and appears to have damaged his

hands while he was in the cell. (Tr. Vol. II, pp. 193, 251.) The deputy in charge of the pod did not actually see Appellant break the sprinkler and could not testify as to whether he used the blanket to pull off the head. Appellant was removed from O-pod after the incident and placed in a cell where the sprinkler head is out of reach.

{¶5} Photographs were taken to document the breakage and the flooding of O-pod. Through the window of the door on cell 28, a photograph was taken of Appellant with his hands in the air in front of him, and water on the floor of the cell. (The photo was described during testimony, but does not appear in the record transmitted on appeal). Deputy Hyshaw testified that this photograph was taken before the door to cell 28 was opened after Appellant broke the sprinkler head. The deputy confirmed on rebuttal that between the time the sprinkler broke and the picture was taken he did not physically interact with Appellant in any way. (Tr. Vol. II, p. 271.) In order to fix the sprinkler head in cell 28 and stop the leak, the fire suppression system had to be shut off for the entire pod as well as the pod below. While repairs were completed, seventy-two cells were without fire protection.

{¶6} Appellant does not dispute the events leading up to his placement in O-pod cell 28. However, Appellant maintains that he was still wearing restraints when he was placed in the cell. Appellant claims that once he was placed in the cell, the deputy asked him if he would like to have the restraints removed. Appellant claims that he told the deputy to leave the restraints on and the deputy complied with his wishes. According to Appellant, after he was placed in the cell and chose to remain in restraints, he and the other individuals in the pod were talking through their doors and everyone in the pod became agitated. Appellant maintains that he never struck

the walls or door of his cell and did not break the sprinkler head. He says that his hand was injured when he was incarcerated in 2002, and that the old injury is still visible, and was not the result of striking anything in his cell on April 26, 2010. Appellant maintains that the photograph depicting him in the cell with his hands free and in front of him was taken after the deputies responding to the flooding removed his restraints and told him to hold his hands in front of him so that they could check his hands for injuries. According to Appellant he did not break the sprinkler head, the system broke on its own while he was alone and handcuffed by choice in his cell.

{¶7} Another inmate, also held in O-pod at the time, testified on behalf of Appellant. The inmate testified that Appellant was wearing handcuffs behind his back when he entered O-pod and that after Appellant was placed in his cell in O-pod the sprinkler, which the witness could hear, went off. The inmate explained that he was in his own cell and could not see inside Appellant's cell; that he did not know whether Appellant's restraints were removed once he entered his cell; and that he also did not recall the amount of time that passed between Appellant entering his cell and the sprinkler going off.

{¶8} Captain John Beshara, the officer in charge of the jail, reviewed the investigative report prepared by the deputy on duty when the incident occurred. He also interviewed Appellant the day after the incident. When the captain asked Appellant about the incident Appellant reportedly responded "I'm a federal inmate. You can't charge me. I don't care about your charges * * *." (Tr. Vol. II, p. 171.) According to Captain Beshara, Appellant was obviously upset that he was being held in the county jail when he was a federal inmate. (Tr. Vol. II, p. 170.) The captain also

explained that although there is a video surveillance system that captures the common areas of the jail, there is no video taken of the interior of the inmates' cells. For this reason, according to the captain, only the still photographs taken by the responding deputy were offered in evidence. (Tr. Vol. II, pp. 174-176.) The captain also testified that it was jail policy to transport inmates to O-pod in handcuffs, both for the safety of the transport staff and to allow the prisoner to "keep face with the other inmates." (Tr. Vol. II, p. 263.) According to the captain, although a log was kept each day, entries in the log book would not reflect whether an inmate was cuffed or when cuffs were removed because it is "something that happens so often that it wouldn't make sense to make a record * * *." (Tr. Vol. II, p. 267.)

{¶9} Appellant was indicted on one count of vandalism and one count of disrupting public services. Trial commenced on August 10, 2010 and concluded on August 11, 2010. The jury returned a guilty verdict on both counts in the indictment on August 11, 2010. The court polled the jury and the verdict was confirmed. Defense counsel's motion for dismissal notwithstanding the verdict was denied. Appellant's post-verdict motions for acquittal and new trial were overruled. The court proceeded immediately to the sentencing hearing and the prosecution requested maximum consecutive sentences. Appellant spoke on his own behalf and renewed his demands that he be held in a federal facility. On April 12, 2010 the trial court sentenced Appellant to one year in jail and costs of prosecution on count one, vandalism, and one and a half years in jail and costs on count two, disrupting public services, to be served consecutively. No motion was made to merge Appellant's convictions for sentencing purposes in the record. No discussion of merger occurred

during the sentencing hearing. After trial and sentencing the trial court granted trial counsel's motion to withdraw, found Appellant indigent, and appointed new counsel for purposes of appeal. Appellant filed a timely appeal.

<u>Argument and Law</u>

<u>ASSIGNMENT OF ERROR NO. 1</u>

Counsel rendered ineffective assistance on behalf of Mr. Williams in violation of the 6th and 14th Amendments to the United States' Constitution.

{¶10} Appellant argues in support of his first assignment of error that defense counsel's decision not to object to the prosecution witness's characterization of O-pod as a disciplinary portion of the jail, and to the testimony of maintenance staff as to the origin of the damage to the sprinkler head, both amounted to ineffective assistance of counsel. Appellant fails to demonstrate that trial counsel's performance was deficient and further fails to demonstrate prejudice as a result of these alleged errors.

{¶11} To prevail on a claim of ineffective assistance of counsel, Appellant must show not only that counsel's performance was deficient, but also that he was prejudiced by that deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, (1984) *see also State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶107. "Deficient performance" means performance falling below an objective standard of reasonable representation. "Prejudice," in this context, means a reasonable probability that but for counsel's errors the result of the

proceeding would have been different. *Strickland* at 687-688, 694. Moreover, in evaluating the performance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-691. Each of the alleged deficiencies will be evaluated under the two-pronged *Strickland* test.

{¶12} Appellant argues that it was inappropriate to allow jail staff to explain the function of O-pod within the jail. Captain Beshara explained that O-pod was used to place inmates in solitary confinement: a solo cell with a 23 and 1 schedule, which means the individual is held alone in a cell, not visible to other inmates for 23 hours of the day and allowed a single hour alone outside the cell but still separate from other inmates. According to the captain's testimony, "if we have inmates that can't get along in general population or who are causing problems with the staff or other inmates, they ultimately get transferred to O-Pod, called the disciplinary range." (Tr. Vol. II, pp. 164-165.) Ohio Rule of Evidence 404(A) generally prohibits "[e]vidence of a person's character or a trait of character" when such evidence is used for "the purpose of proving action in conformity therewith on a particular occasion." Evid.R. 404(A). Similarly, Evid.R. 404(B) prohibits the use of "other crimes, wrongs or acts" when used to "prove the character of a person in order to show action in conformity therewith." However, the rule allows the use of such evidence for "other purposes," including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶13} In this instance, the testimony of Captain Beshara and Deputy Hyshaw was used to establish that Appellant was placed in a cell alone, out of the view of others, which created the opportunity for the vandalism he was charged with to occur unobserved. The fact that Appellant was removed to this location as a result of acting out over his frequently expressed displeasure at being held in a county rather than a federal facility further establishes motive and intent. None of the testimony identified by Appellant in support of his argument was used to suggest that Appellant, a federal felon being held for hearing on a violation of the terms of his probation, must have broken the sprinkler because he was a discipline problem. Rather, it was used to explain the circumstances under which he was being held and how those circumstances created the opportunity for Appellant to damage the sprinkler system while unobserved. No specific bad act was described and no similar behavior was offered. The testimony in question does not amount to a violation of Evid.R. 404(A) or (B), because no prohibited bad act testimony was offered, and the circumstances under which Appellant was being held were directly related to his motive and opportunity. Based on the record here, there is nothing to indicate that an objection was merited to the trial court or that if an objection was made it would have been sustained. Counsel's decision not to object was not error and did not prejudice Appellant on this issue.

{¶14} Appellant also argues that counsel should have objected to the prosecutor's request that Mr. Matasy, the employee in charge of repair and maintenance at the justice center who responded to the incident in O-pod and performed the necessary repairs on April 26, 2010, testify as to his opinion of how the

breakage occurred. Appellant claims that the witness should not have been allowed to render an opinion on the cause of the breakage without having been qualified as an expert on the subject. According to Appellant, this testimony was in violation of Evid.R. 701, which limits the testimony of lay witnesses to statements "in the form of opinions or inferences" which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶15} The witness's testimony established that he was responsible for maintenance and repairs in the jail; that he had fourteen and a half years of experience in the facility; and that he had worked at the facility in that capacity from the time the facility was built. He explained how the sprinkler system worked and testified "[t]o the best of [his] knowledge" that the sprinkler heads were made of "brass and stainless steel and they're institutional grade." (Tr. Vol. II, p. 196.) He described the process necessary to repair the sprinkler system and testified that he had replaced many sprinkler heads damaged by inmates but had never known one of the sprinkler heads to spontaneously break. He personally performed the repair on cell 28 and identified the two pieces of the broken sprinkler he retrieved on April 26, 2010. In response to the prosecutor's questions, he opined that this sprinkler head, like all the others he had repaired, was broken by a person and did not spontaneously break in the manner the defense suggested. The witness was then cross-examined as to how he knew that the sprinkler head was broken, and he responded that he knew it was broken because when he entered the cell, it was found in pieces. He then admitted in response to questioning that he did not "retrace

how specifically it was broken" and that he "[had] no idea how it became broken." (Tr. Vol. II, p. 205.)

{¶16} The record reflects that this witness offered no specific opinion as to how the sprinkler head "became broken," but instead testified as to his first-hand experience of how the system works, the historical absence of spontaneous breakage, and the ability of a person, if he or she chose, to break the head with concentrated effort. He also discussed the logistics of repair. There is nothing in this testimony that suggests "metallurgical or hydrological knowledge" was necessary or that the witness was asked to give what would amount to expert testimony. (Appellant's Brf., p. 8.) The fact that the witness was unable to offer conclusive testimony as to how the head became broken was more than adequately established by cross-examination resulting in the statement: "How it became broken I do not know." (Tr. Vol. II, p. 205.) The witness's testimony was given on precisely those matters that are "rationally based on the perception of the witness" and expressly allowed by Evid.R. 701. Where the prosecution sought a conclusion that was beyond the witness's direct knowledge, it was placed in the proper context by cross-examination. Trial counsel's performance during the examination and cross-examination of the witness was not deficient and did not prejudice Appellant.

{¶17} Appellant argues that he was prejudiced by this testimony because there was nothing in the record to demonstrate Appellant had the physical wherewithal to destroy the sprinkler head. This is a mischaracterization. Various witnesses for the prosecution testified that they had, in the past, witnessed similar damage to the system by other inmates' use of sheets or shoes. According to

Deputy Hyshaw, Appellant was not restrained in his cell, which contained a mattress and a blanket. Nothing in the record suggests that Appellant was not fully clothed and in possession of his shoes. There is also testimony that suggests Appellant's hands showed evidence of physical damage after this incident, which resulted in a complaint from his counsel who visited him that day soon after the incident occurred, and a medical examination took place as a result of counsel's complaints. According to the testimony in the record, Appellant appears to have been alone in his cell, unrestrained and in possession of the types of materials other inmates had used to break the jail's sprinkler heads. According to the testimony of both sides, when Appellant was placed in the cell, the sprinkler was intact and unbroken. Appellant has failed to demonstrate any error, and even if he could show error he has failed to show that there may be prejudice resulting from the alleged error. Appellant's first assignment of error is without merit and is overruled.

### ASSIGNMENT OF ERROR NO. 2

The jury returned a verdict against the manifest weight of the evidence in violation of the 6th and 14th Amendments of the United States' Constitution.

{¶18} Appellant argues that the state did not produce enough credible evidence to establish that Appellant was the individual who damaged the sprinkler system.

{¶19} When determining whether a criminal judgment is against the manifest weight of the evidence, this Court acts as a "thirteenth juror" to determine whether

"the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). The verdict is not against the weight of the evidence when there is evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978).

**{¶20}** "A verdict that is supported by sufficient evidence may still be against the manifest weight of the evidence. 'Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." ' (Emphasis sic.)" (Internal citations omitted.) *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, *supra*, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶21}** The jury in this instance was faced with two explanations of an incident that had no direct witnesses. Both the prosecution and the defense agree that the sprinkler head in O-pod cell 28 broke on April 26, 2010 while Appellant was alone in

the cell. Various witnesses for the prosecution testified that Appellant was not restrained in the cell, that he had objects in the cell he could use to damage the system, and that in their collective 25 years of experience these sprinkler heads do not spontaneously break. Appellant testified that the sprinkler head spontaneously broke while he was alone and restrained in the cell. A witness for the defense testified that he was unable to see into the cell, but that Appellant entered the pod in restraints, and was placed in the cell before the sprinkler broke. The jury was faced with directly conflicting testimony and chose, as is its role, to believe the prosecution's version. Probative evidence of the elements of each count appears in the record. There is nothing here to suggest that the jury may have lost its way. Appellant's second assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 3

The court erred in ordering that Mr. Williams [sic] sentences be served consecutively in violation of the double jeopardy clause of the 5th Amendment and violation of the 14th Amendment of the United States' Constitution.

**{¶22}** Appellant argues that his convictions for damaging government property and disruption of public services are allied offenses that arise out of the same operative facts and that his consecutive sentences in this case amount to double jeopardy.

**{¶23}** "Allied offenses of similar import" are defined by R.C. 2941.25 (not 2941.45 as identified by Appellant), which provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶24} Although the statute has remained unchanged by the legislature since its passage in 1972 (effective January 1, 1974), Ohio jurisprudence interpreting and applying the statute has undergone several changes. Our analysis has shifted from an evaluation that considers the facts of the individual case, to an objective analysis of the elements of the crimes without reference to the specific conduct concerned, and has recently returned to a fact-driven analysis. *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061.

{¶25} The Ohio Supreme Court's most recent determination, *State v. Johnson*, includes a plurality opinion and two separate concurrences. While all seven justices concur in both the syllabus and the judgment, only three justices are united in the plurality opinion. This has created some divergence of interpretation in applying *Johnson*.

**{¶26}** Every appellate district in Ohio except the First has applied the plurality version of *Johnson* in making a determination whether offenses are allied. *State v. Gilbert*, 7th Dist. No. 08 MA 206, 2012-Ohio-1165, ¶26. The two-step test for allied offenses advanced in the plurality opinion requires the trial or reviewing court to first determine if the "offenses are allied offenses of similar import." *Johnson*, *supra, ¶*48. The court begins this inquiry by asking "whether the offenses were committed by the same conduct" and "whether it is possible to commit one offense *and* commit the other with the same conduct" but not "whether it is possible to commit one *without* committing the other." (Emphasis sic.) *Id.* at ¶47-48. According to the plurality, if the answer to both questions is yes, the "offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.* at ¶48. If, on the other hand, "the court determines that the commission of one offense will *never* result in the commission of the other," then the offenses are not allied and do not merge. (Emphasis sic.) *Id.* at ¶51.

**{¶27}** If the court identifies offenses of similar import, it must then consider whether the offenses were committed separately, or if the defendant has separate animus for each offense. *Id.* at ¶51. If the offenses were committed separately, or if there was separate animus for each, they remain separate for sentencing purposes. *Id.* Under the plurality's formulation of the rule, if under any circumstances the commission of one crime will result in the commission of the other then the offenses are allied and merge, unless the crimes were committed separately or with separate animus. Under the plurality's test, the only way a court could find that the offenses

do not have similar import is if the court determines that it is impossible for the commission of one offense to result in the commission of the other.

**{¶28}** The facts presented in the matter presently before us appear to reflect a single course of conduct that resulted in two separate charges for different criminal wrongs and their resulting harm. Appellant broke the sprinkler head in the cell where he was being held. Breaking the sprinkler was vandalism. The result of this damage, disabling the sprinkler system in the adjoining cells and a significant portion of the building, constitutes a disruption of the ability of law enforcement and emergency services to respond to a fire in the building. This disruption placed Appellant and the other inmates as well as prison staff at risk of serious physical harm. This combination of conduct and resulting charges highlights the dilemma in trying to apply the test set forth in *Johnson*. If we look at this case only in the abstract, the facts would suggest that the charges should merge. However, since the statutes are designed to address different harms, and it is not at all clear what harm Appellant intended, here, the offenses may not be allied.

**{¶29}** Appellant was charged with one count of vandalism in violation of R.C. 2909.05(B)(2)(E), which provides:

No person shall knowingly cause serious physical harm to property that is owned, leased, or controlled by a governmental entity. * * * Whoever violates this section is guilty of vandalism * * * vandalism is a felony of the fifth degree.

Appellant does not dispute that the sprinkler head was owned, leased or controlled by the government, or that the destruction of the head was an act of vandalism.

**{¶30}** Appellant was also charged with violating R.C. 2909.04(A)(3)(C), which provides:

No person, purposely by any means or knowingly by damaging or tampering with any property, shall * * * [s]ubstantially impair the ability of law enforcement officers, firefighters, rescue personnel, emergency medical services personnel, or emergency facility personnel to respond to an emergency or to protect and preserve any person or property from serious physical harm * * * [w]hoever violates this section is guilty of disrupting public services, a felony of the fourth degree.

**{¶31}** Appellant alleges that the two offenses are allied and should merge for the purposes of sentencing. According to Appellant, under the statutory definitions of each offense, an offender could not vandalize public property without tampering with public property and one could not vandalize public property without disrupting government services. Appellee does not specifically address Appellant's argument concerning an overlap in the statutory definitions and instead argues that there was separate animus for each offense.

**{¶32}** Appellant's argument overstates the correspondence between the two statutes which are intended to address specific and different public harms, defacing or damaging government property as opposed to disrupting or preventing law enforcement and emergency services personnel from carrying out their duties. The

statutes are formulated with clear, and diverging, purposes. One is intended to maintain the integrity of all government property, broadly. The other is intended to ensure the delivery of law enforcement, fire, medical, and other emergency services, without interruption. Given the difference between the conduct each statute is designed to address, it seems clear that in the majority of cases a violation of one would not involve a violation of the other. Examples of potential violations include prank calls to 9-1-1, failure to yield to emergency vehicles, spray painting government buildings, or stealing or defacing signage. While a false 9-1-1 call and failure to yield may, in fact, result in interruptions of government services in some cases, the vandalism of spray painting or defacing property would not usually interrupt these services. In the case before us, both violations arose from one set of facts. However, the issue in this instance appears to depend on Appellant's reason for breaking the sprinkler head or what he knew or should have known would happen once he inflicted the damage.

{¶33} In opposition to Appellant's assertion that the offenses are allied, the state focuses on the separate animus portion of the rule rather than any overlap in the statutes. Appellee argues that Appellant could have vandalized government property without disrupting government services, but instead chose to vandalize his cell in a manner that disrupted services, and concludes that this choice is evidence that he had two separate purposes. According to Appellee the fact that a single act served both purposes does not negate separate animus and "Appellant's clear intention of breaking the sprinkler head completely off the wall demonstrated his intent to interrupt or impair public services within the county jail." (Appellee's Brf., p.

22.) While the state is correct to focus on separate animus, the state suggests an inference that appears to reach too far beyond the evidence as it currently appears in the record.

**{¶34}** However, it is true that Appellant repeatedly expressed his dissatisfaction that he was being held in a county facility. It is equally true that Appellant had experience in federal, state and county facilities. It is certainly possible that Appellant was aware that removing the sprinkler head would result in a shut down of the cell block. It is equally possible that Appellant thought that if he caused enough damage that he would be removed from the facility. He may simply have desired to force his removal from that particular cell. Unfortunately, the trial court in this instance did not have an opportunity to consider merger and flush out the issue of animus. There is too little information in the record to determine whether the two offenses were genuinely committed as a single act, or if, in fact, separate animus exists in the commission of these two crimes.

**{¶35}** Because the trial court did not have the opportunity at sentencing to consider whether Appellant's convictions were allied offenses and due to the absence of necessary information in the record that would allow us to make this determination, Appellant's sentence is vacated and the matter remanded to the trial court for a hearing on allied offenses, and for resentencing.

Conclusion

**{¶36}** The record shows that the conduct of trial counsel was not deficient. Appellant failed to identify any prejudicial error resulting from the alleged deficiencies in trial counsel's conduct. Appellant's convictions were supported by competent, credible, evidence which, if believed, supports a guilty verdict. However, it is unclear from this record whether the two offenses were allied offenses of similar import and should merge for sentencing purposes. For these reasons, Appellant's sentence is vacated and the matter remanded for a hearing on the merger issue and resentencing.

Donofrio, J., concurs.

DeGenaro, J., concurs.