[Cite as *State v. Todd*, 2015-Ohio-2682.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 12 CO 28 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| MIRANDA V. TODD | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
Common Pleas of Columbiana County,
Ohio
Case No. 10-CR-302

JUDGMENT:    Affirmed.

APPEARANCES:

For Plaintiff-Appellee:    Atty. Robert Herron
Columbiana County Prosecutor
Atty. Timothy J. McNicol
Assistant Prosecuting Attorney
105 South Market Street
Lisbon, Ohio  44432

For Defendant-Appellant:    Atty. Bernard C. Battistel
P.O. Box 803
Steubenville, Ohio  43952

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  June 29, 2015

WAITE, J.

**{¶1}** Appellant Miranda V. Todd appeals her June 22, 2010 Columbiana County Common Pleas Court conviction on charges of murder, involuntary manslaughter, and endangering children that arose following the death of Appellant's youngest child. Appellant first argues that the extensive pretrial publicity her case received denied her a fair trial. Contrary to Appellant's argument, the record demonstrates that the *voir dire* process in this case was comprehensive and there is no evidence that any juror was biased. Appellant next argues that the trial court erred in admitting photographs into evidence that were taken of the child at the hospital and the funeral home as they were unnecessarily prejudicial and had no probative value. Notwithstanding Appellant's argument, the record establishes that the photographs supplemented the medical testimony and provided the jury with an appreciation of the nature and circumstances of the offense. Next, Appellant contends that her murder conviction is against the manifest weight of the evidence. Despite Appellant's contention, the record clearly provides extensive support for the jury's verdict. Finally, Appellant argues that she received ineffective assistance of counsel. The record establishes that counsel was not deficient. Accordingly, Appellant's arguments are without merit and the judgment of the trial court is affirmed.

<u>Facts and Procedural History</u>

**{¶2}** Appellant was the mother of three children: a son who lived with Appellant's mother, a daughter who resided with her father, and a seven-month old son ("child") who lived with Appellant. For a period of time, Appellant was living with

one of the two putative fathers of the child. After leaving the child's presumptive father, Appellant appeared at the doorstep of Kayli Stiffler, a former high school classmate. Appellant asked Stiffler if she could stay there for a few days. Stiffler lived at the apartment with her long-time boyfriend, Steven Van Pelt, and their six-year old son. After Stiffler and Van Pelt agreed to allow her to stay at their apartment, Appellant and the child moved in. Shortly thereafter, a romantic relationship developed between the three adults.

{¶3} Sometime in late June, others began to notice bruises on the child. The first bruises were observed by Appellant's grandmother. When the grandmother pressed Appellant about the bruises, she claimed the child had fallen asleep on a hard, plastic toy which had left an imprint on the child's side. The grandmother was not convinced and expressed her concerns to Appellant's mother, who called children's services. No action was taken by children's services.

{¶4} In addition to the bruises, Appellant's actions began to concern others. During the Fourth of July weekend, the father of Appellant's daughter asked her if she could take their daughter for the weekend. Appellant agreed, but returned her after one day as she wanted to attend a Fourth of July party. She informed the father that their daughter could not return to the apartment because she "brought demons" with her.

{¶5} Shortly thereafter, Appellant began to exhibit signs of jealously towards Stiffler and her relationship with Stiffler and Van Pelt began to deteriorate. In one instance, the two women got into an argument and Appellant attacked Stiffler. Van

Pelt threatened to throw the next person who struck the other out of the apartment. Appellant became angry and punched him, as she believed that threat was aimed at her. Appellant then took Van Pelt's gun and sat on the bathroom floor with it. After Van Pelt took the gun from her, she punched the floor repeatedly, causing injuries to her knuckles. Appellant later apologized to Stiffler and claimed that she did not remember attacking her.

{¶6} On July 7, 2010, Appellant left the child with John Ingledue, one of the men she believed may have been the child's father. Later that day, Appellant picked the child up and walked him home in his stroller. When Appellant arrived at the apartment, bruises were observed on the child's forehead. Witnesses testified that the bruises looked like the child's head was gripped by a hand. Ingledue had taken several photographs of the child while he babysat him that day and none of those photographs revealed bruises.

{¶7} On July 21, 2010, Appellant complained to Stiffler and Van Pelt that she could never go out because she did not have anyone to watch the child. Stiffler and Van Pelt found her a babysitter and the three roommates went out to a bar. While at the bar, Stiffler became ill and they had to leave, which visibly upset Appellant.

{¶8} Testimony presented by medical personnel suggests that the fatal injuries suffered by the child occurred before 5:00 p.m. on July 22, 2010. On that day, Stiffler was at work until 3:00 p.m. and Van Pelt was at the apartment with Appellant and the child. When Stiffler got home, Van Pelt told Appellant that he and Stiffler were going to take a trip to Sebring, and Appellant expressed anger that she

was not invited. Stiffler and Van Pelt left the apartment shortly after 3:00 p.m. and returned around 6:00 or 7:00 p.m.

{¶9} On their return, they attempted to make amends with Appellant and invited her into the bedroom to smoke marijuana with them. Shortly after she joined them, Van Pelt asked Stiffler for a massage, which infuriated Appellant. She stormed out of the room and slammed the door. Shortly thereafter, Appellant brought the child into the bedroom and asked if either of them knew anything about the lump on his head. Neither roommate had previously seen the lump, but told Appellant to take him to the hospital. Appellant refused to take the child to the hospital because she feared she would be accused of child abuse. Stiffler and Van Pelt observed Appellant attempt to push the lump back into the child's head with her fingers. When that did not work, she held the child's head steady with one hand and pushed on the lump with the other hand.

{¶10} She then put the child in his crib with an ice bag propped against his head and went for a walk with a male friend. After she returned, Stiffler and Van Pelt left to purchase alcohol and drove around for a time, smoking marijuana. Soon after they returned to the apartment, Appellant rushed into the kitchen with the child, who was blue and lifeless.

{¶11} Stiffler took Appellant and the child to the hospital. On the way to the hospital, she heard Appellant say "I'm sorry, God, I didn't mean to do this. Please don't take my baby from me. I didn't mean to do this, God." (Tr. Vol. IV, p. 964.) The child was pronounced dead after resuscitation efforts failed. The injuries

included: bruises in varying stages of healing, eleven rib fractures, a lacerated liver, and two skull fractures.

**{¶12}** After the child was pronounced dead, Appellant told Van Pelt that she was going to jail for the rest of her life because the police had accused her of killing the child. She also told him that the police had asked her about the guns that he kept at the apartment. Van Pelt became concerned and agreed to lie to the police for her. Appellant moved out of the apartment and temporarily moved in with Ingledue, his fiancé, and the fiancé's parents.

**{¶13}** The police investigation into the child's death resulted in over fifty interviews being taken. Ultimately, Appellant was charged with one count of murder, an unclassified felony; one count of involuntary manslaughter, a felony of the first degree; and one count of endangering children, a felony of the third degree. On June 22, 2012, a jury found her guilty on all three counts. Appellant was sentenced to fifteen years to life on the murder charge, which merged with the manslaughter charge. This sentence was to run consecutive with three years on the endangering children charge. This timely appeal followed.

<u>ASSIGNMENT OF ERROR NO. 1</u>

THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION FOR CHANGE OF VENUE.

**{¶14}** Appellant contends that pretrial publicity surrounding her case prevented her from receiving a fair trial. Appellant asserts that there is a presumption of prejudice when a case receives extensive pretrial publicity. In support of her

argument, Appellant attempts to distinguish her case from *State v. Gilbert,* 7th Dist. No. 08 MA 206, 2012-Ohio-1165. Appellant emphasizes that *Gilbert* was tried in Youngstown, which has a population of over 60,000. Conversely, her case was tried in Salem, which has a population of 12,000. Appellant explains that as a result of the population difference, the pretrial publicity would have a greater effect on Salem's limited jury pool.

{¶15} In addition, Appellant stresses that the *voir dire* process in *Gilbert* was far more extensive than the process in her case. Appellant states that *Gilbert's voir dire* constituted two-thirds of the trial transcript whereas the *voir dire* in her case covers less than one-sixth of the trial transcripts. Appellant highlights the fact that the effects of the publicity were not lost on the prosecutor, who at one point moved to sequester the jury.

{¶16} The state responds by arguing that an extensive *voir dire* process was undertaken and each side had the opportunity to question potential jurors. The state asserts that the process worked in this case as evidenced by the fact that potential jurors with previous knowledge of the case were excused for cause. The state distinguishes this case from *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *Irvin* involved the public release of highly prejudicial information, including the defendant's criminal record and confessions to previous crimes, and noted that the defendant's lawyer faced disbarment if he refused to represent the defendant. The state contends that this type of inflammatory media coverage did not occur here.

**{¶17}** Crim.R. 18(B) provides that: "Upon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." Crim.R. 18 does not require a trial court to grant a change of venue merely because of extensive pretrial coverage. *State v. McKnight,* 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶60. In fact, "[b]y itself, even pervasive adverse pretrial publicity 'does not inevitably lead to an unfair trial.' " *Gilbert, supra,* at ¶95.

**{¶18}** According to the Ohio Supreme Court, "a 'careful and searching *voir dire* process provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial trial from the locality.' " *State v. Yarbrough,* 104 Ohio St.3d 1, 2004-Ohio-6087, 911 N.E.2d 845, ¶61.

**{¶19}** A trial court has great discretion in ruling on a change of venue motion. *State v. Landrum*, 53 Ohio St.3d 107, 116, 559 N.E.2d 710 (1990). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams,* 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980), citing *Steiner v. Custer*, 137 Ohio St. 448, 31 N.E.2d 855 (1940); *Conner v. Conner*, 170 Ohio St. 85, 162 N.E.2d 852 (1959); *Chester Township v. Geauga Co. Budget Comm.*, 48 Ohio St.2d 372, 358 N.E.2d 610 (1976).

**{¶20}** In *Gilbert,* approximately thirty-five newspaper and online articles and several televised news programs covered the case. *Id.* at ¶94. During *voir dire,* the

trial court questioned the prospective jurors to determine if they experienced "firsthand information, interactions within the community, or media coverage" regarding the case.  *Id.*  Those who indicated that they knew of the case were asked about the extent of their knowledge and whether they could set aside that information and fairly decide the case based on the evidence presented in court.  On appeal, we held that the media coverage of the case did not rise to so great a level that it denied the defendant a fair trial.  We also found that the *voir dire* process was comprehensive and there was no evidence any member of the jury exhibited bias.  *Id.*

**{¶21}** The *voir dire* process in the instant case was similar to that undertaken in *Gilbert.*  First, each potential juror was asked if they had any knowledge of the case.  The trial court then expanded on that question and specifically inquired whether each juror, even those who stated that they had no knowledge of the case, had read anything in a newspaper, online source, or social network site about the case.  Further, the trial court asked the prospective jurors whether they received or regularly read a local newspaper.

**{¶22}** Those prospective jurors who had heard about the case were asked as to the level of their knowledge, whether that knowledge gave them an opinion of guilt or innocence, and whether they could fairly decide the case.  The trial court questioned each prospective juror on whether they knew anyone involved in the matter.  Finally, regardless of the prospective jurors' answers, the trial court asked prospective jurors whether they could fairly decide the case based on the evidence

and the law. Importantly, both sides were permitted to question prospective jurors regarding their exposure to the case.

**{¶23}** Although the *voir dire* took up a smaller portion of the trial transcripts than in *Gilbert*, the record establishes that most of the prospective jurors in this matter had not heard of the case. Those who had some familiarity with the matter had limited knowledge. We also note that the length of the *voir dire* portion of the transcripts is but one consideration and in no way reflects, standing alone, an abuse of discretion. The record establishes that only twelve of the forty prospective jurors had any knowledge of the case, while the remaining twenty-eight had never heard of the matter. Of the twelve who had some familiarity, most of them did not know actual details and had read about it two years prior.

**{¶24}** Appellant encourages us to find that a presumption of prejudice exists when there is extensive pretrial coverage. *Irvin, supra.* However, the Ohio Supreme Court has held that such presumption occurs only in rare cases. *McKnight, supra* at ¶61. The record clearly demonstrates that this is not one of those rare cases. In addition, the Supreme Court has stated that a defendant must show that a juror was actually biased as a result of pretrial publicity. *Id.,* citing *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). Appellant has not presented any such evidence, aside from her mistaken belief that prejudice is presumed when there has been extensive media coverage.

**{¶25}** The trial court was presented with twenty-eight prospective jurors with no knowledge of the case, and several more with only limited knowledge of the case

from which to choose a panel of twelve. As the *voir dire* process was comprehensive and there is no evidence that any juror was actually biased, the trial court did not abuse its discretion in denying Appellant's motion for change of venue. Accordingly, Appellant's first assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S OBJECTION TO THE ADMISSION AND PUBLICATION OF EXHIBITS 2A THROUGH 2I AND 3A THROUGH 3D.

{¶26} Appellant contests the admission of two sets of exhibits: photographs of the child lying dead in a hospital bed and photographs showing the child at the funeral home. As these photographs are neither crime scene nor autopsy photographs, Appellant argues they have no probative value. Appellant also urges that the mere fact that the child died of these injuries is enough for a trier of fact to find that the injuries were serious. Thus, these photographs were unnecessary. Appellant contends that they lacked probative value and created unfair prejudice.

{¶27} In response, the state asserts that admission of exhibits is within the discretion of the trial court and will be reversed only on finding a clear abuse of discretion and material prejudice. As each of these photos depicted injury suffered by the child and showed motive, the state argues that they had probative value. Further, the state argues that the fact that these photos may be described as gruesome does not in and of itself render them inadmissible. Moreover, the state

notes that it attempted to limit the effect of these photographs by using only twenty-eight out of over sixty photos that were available. Accordingly, the state contends that the probative value of the photos outweighs any prejudice Appellant may have suffered.

**{¶28}** Pursuant to Evid.R. 403(A): "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

**{¶29}** The Ohio Supreme Court has held that a trial court did not commit error in admitting photographs in support of a forensic pathologist's testimony that a victim sustained injuries sufficient to cause death, particularly as the photographs showed the jury the effects of all of the injuries suffered by the victim. *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 739 N.E.2d 749, ¶56. Further, even a photograph that can be characterized as gruesome is admissible if the trial court, in exercising its discretion, feels that it would be useful to assist the jury. *State v. Woodwards,* 6 Ohio St.2d 14, 25, 215 N.E.2d 568 (1966).

**{¶30}** The Ohio Supreme Court has also stated that photographs that illustrate a coroner's testimony and provide a general perspective of a victim's body are relevant and admissible. *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶103. The Court noted that such photographs provide the jury with a "total appreciation of the nature and circumstances of the crimes." *Id.* at ¶109, citing *State v. Evans*, 63 Ohio St.3d 231, 251, 586 N.E.2d 1042 (1992).

{¶31} There are two sets of photographs Appellant complains of in this appeal: photographs of the child in the hospital and photographs of the child at the funeral home. The trial court allowed the photographs to be admitted after finding that they would help the jury to understand the medical evidence and provide the jury with an appreciation of the nature and circumstances of the offenses. We will first address the nine hospital photographs showing the various bruises on the child's body.

{¶32} The first photograph depicts the child with a blanket over his body and, according to testimony, was taken to show the scene where the child was pronounced dead and where authorities first observed the body. The second photograph is of the whole body of the child and was taken to show the condition of the child when he was brought into the hospital and what devices were attached to him in the resuscitation efforts.

{¶33} The third and fourth photographs show the deformed area of the child's head and were taken to illustrate what was likely one of the fatal injuries. The photographs were also used to refute Appellant's statements to medical personnel that she did not think the child's injuries were significant. The photographs further illustrated the bruise patterns and coloring, which according to expert testimony indicated that the bruises occurred over a period of time and did not result from one incident, alone. One of the photographs shows what the coroner's forensic investigator believed was evidence of blunt-force trauma, which is the purported

cause of death. The fourth photograph better illustrated that some of the bruises were "fresh."

**{¶34}** The fifth and sixth photographs depict the area affected by the skull fracture located behind the child's ear, which was described as a second potentially fatal injury. One of the photographs reveals swelling and an indentation just behind the ear. The other photograph similarly shows swelling, and signs of specific contact with the ear area. The seventh photograph shows a close up of the ear area and reveals potential "concentrated impact, blunt-force trauma," another cause of death. (Tr. Vol. I, p. 239.)

**{¶35}** The eighth photograph shows the uninjured side of the child's head and was taken for purposes of comparison. The ninth, and final, hospital photograph contains the bruises to the child's rib area. The sole photograph of this area depicts significant bruises to the rib, side, and liver areas of the child.

**{¶36}** The other photographs disputed were taken at the funeral home. The four photographs were taken to more prominently demonstrate the bruises to the child's forehead, side of head, and rib cage area. According to testimony from the coroner, bruises become more prominent and noticeable after the embalming process. Thus, the jury would be better able to observe the size and shape of the bruises and detect bruises that were hidden before the embalming process. This is evidenced by the state's exhibit 3A, which reveals a bruise that was not observable in the hospital photographs.

**{¶37}** Although these photographs are disturbing, Appellant has not shown that she suffered prejudice as a result of the trial court's decision. Although Appellant argues that the prejudicial nature of the photographs was evident as one juror was unable to continue after viewing the photographs, this assertion mischaracterizes the facts. One juror's wife called the court to complain that her husband was depressed after viewing the photographs. However, the juror, himself, explained that the photographs did not bother him. He stated that he was suffering symptoms of depression because he stopped taking a prescribed medication. The juror was then excused, but not based on his reaction to the photographs.

**{¶38}** Appellant claims that this juror was so affected by the photographs that he had to see his therapist and could not come to court. Again, this is a mischaracterization of the facts. The record reflects that the juror had begun therapy prior to his service as a juror. Thus, the therapy is unrelated to the photographs. Further, according to the juror's own testimony, he was not affected by seeing the photographs.

**{¶39}** The record demonstrates that both sets of photographs were used to supplement medical personnel and the coroner's testimony and to assist the jury in understanding the medical evidence. The photographs additionally depict the frequency, severity, color, and patterns of the bruises which provided the jury with an appreciation of the nature and circumstances of the offense. The Ohio Supreme Court has permitted introduction of gruesome photographs for these purposes in *Lamar, Woodwards, Diar,* and *Evans.* As such, the record demonstrates that

admission of these photographs was not an abuse of discretion. Appellant's second assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 3

THE DEFENDANT-APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE STATE DID NOT MEET ITS BURDEN OF PROOF WITH REGARD TO COUNT ONE MURDER.

**{¶40}** Appellant argues that her murder conviction is against the manifest weight of the evidence. Appellant focuses her argument on Steven Van Pelt, whom she argues was inconsistent in his statements and admitted during his testimony that he lied to investigators. Further, she claims that Van Pelt was alone with the child when he suffered one of his injuries. Appellant also questions her alleged motives to kill her child. As the state argued that Appellant was using the child to obtain financial assistance, she argues that it would not make sense for her to kill him.

**{¶41}** She also contests the state's argument that she killed her child to obtain an amount of personal freedom. She asserts that multiple people, including the two men who possibly fathered the child and her mother, sought custody of the child. Thus, she could have simply transferred custody to be free from this responsibility. Finally, she argues that although she erred in not taking the child to the hospital sooner, that in and of itself does not mean that she caused the injuries.

**{¶42}** In response, the state contends that Appellant's behavior before and after the death of the child supports her conviction. The state argues that Appellant

was desperate for attention, mainly from Van Pelt, and for her freedom. The state notes that at least one of the child's injuries occurred after Van Pelt paid more attention to Stiffler than Appellant.

**{¶43}** The state also argues that Appellant's statements after the child's death could be interpreted as confessions. First, she stated that she liked drama and attention and should have been an actress. Second, while driving the child to the hospital, she said: "I'm sorry, God, I didn't mean to do this. Please don't take my baby from me. I didn't mean to do this, God." (Tr. Vol. IV, p. 964.) During interviews with investigators her statement changed from "I didn't do it" to "I believe I didn't do it" and "I don't remember doing it." (Tr. Vol. VI, p. 1470.) The state contends that these statements, which were not contradicted by the defense, could be construed as a confession. Thus, the state contends that Appellant's conviction is supported by the manifest weight of the evidence.

**{¶44}** Under Article IV, Section 3(B)(3) of the Ohio Constitution, appellate courts are authorized to assess the weight of the evidence. *State v. Draper,* 7th Dist. No. 07 JE 45, 2009-Ohio-1023, ¶25. When reviewing a manifest weight of the evidence claim, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at ¶26, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶45}** A manifest weight of the evidence review looks to whether the evidence is persuasive or believable. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶12, citing *Thompkins, supra.*

**{¶46}** When a court of appeals disagrees with a jury's decision and reverses a verdict, the court acts as a thirteenth juror. *Id.* at 387, citing *Tibbs* v. Florida, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Thus, an appellate court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Draper, supra,* at ¶29. In order to reverse a jury verdict under manifest weight of the evidence, three appellate judges must concur. *Id.*, citing *Thompkins* at 389.

**{¶47}** During the child's lifetime, it is apparent from the record that Appellant paid little attention to him. Multiple witnesses testified that the child was always in his "pack and play" or lying on the floor by himself. Appellant's desire to free herself of her responsibilities as a mother is also reflected in her decision to send her daughter, whom she rarely saw, back to the father in order to attend a Fourth of July party.

**{¶48}** The record also demonstrates that at least some of the child's injuries occurred when Appellant became jealous of Stiffler and Van Pelt's relationship. One injury occurred after Van Pelt asked Stiffler for a massage and Appellant stormed out of the room and slammed the door. Shortly thereafter, she brought the child into the room with a large lump on his head. Despite Stiffler's plea to take child to the

hospital, Appellant instead attempted several times to push the lump back into the child's head. Once Stiffler and Van Pelt went out that night, and instead of obtaining care for the injured child, she waited for the pair to return before presenting them with the blue and apparently lifeless child.

**{¶49}** The record also demonstrates that Appellant was alone with the child when many of the injuries occurred. When the bruises on the child's forehead appeared, Appellant had just returned from picking him up from Ingledue's house. Ingledue had taken a series of photographs of the child during his stay that day and the child did not have any bruises during that time. Despite Stiffler's offer to give Appellant a ride to pick up the child, Appellant insisted on walking alone to and from Ingledue's residence. The bruises were observed for the first time once Appellant brought the child home. Testimony presented by medical personnel is that the fatal injuries occurred before 5:00 p.m. on July 22, 2010. The testimony also reflects that Appellant was alone with the child from around 3:00 p.m., when Stiffler returned from work and left for Sebring with Van Pelt until 6 or 7:00 p.m. when the pair returned.

**{¶50}** Additionally, Appellant was heard to make several incriminating statements. On the way to the hospital, Stiffler heard Appellant say "I'm sorry, God, I didn't mean to do this. Please don't take my baby from me. I didn't mean to do this, God." While at the hospital, Appellant first told investigators that she did not harm the child. In a subsequent interview, she changed her words to "I don't believe I did this." Later, she indicated that she was going to seek help to remember what happened to the child.

{¶51} Appellant's behavior after the child's death is also telling. There was testimony from witnesses who said that Appellant seemed relieved after the child's death. Appellant's alleged relief was evidenced by a statement made after the child's funeral. Witnesses testified Appellant told them that she had obtained closure and that her grieving process was over. She stated that she now believed she needed a boyfriend, an apartment and a job. That same evening, she began a relationship with a male friend. Witnesses testified that on the day after her son was buried, Appellant was seen publicly "making out" with this man.

{¶52} That same day she also told witnesses "[t]hat she should have took drama in high school because she could fool anybody. And she could become an award-winning actress." (Tr. Vol. VII, p. 1738.) The new relationship was short lived and Appellant soon after spent the night with another man. This behavior led those around her to believe that she had caused the child's death so that she could party and have male friends. A witness testified that those around her were shocked by the lack of grief or sadness expressed by Appellant.

{¶53} If believed, all of this evidence derived from witness testimony presents competent and credible evidence from which a reasonable juror could have found that Appellant killed the child. Although Appellant tries to lay the guilt on Van Pelt, the jury, which heard all the evidence, found Appellant guilty of the crime. As regards credibility, the jury was free to believe or disbelieve all or any part of the witness testimony. While there is no direct evidence against Appellant, the record is replete with circumstantial evidence. As competent, credible evidence exists on the record,

we will not disturb the jury's verdict. There is nothing in the record to show that the jury clearly lost its way. Accordingly, Appellant's third assignment of error is without merit and is overruled.

ASSIGNMENT OF ERROR NO. 4

THE FAILURE OF DEFENSE COUNSEL TO INTERVIEW LISTED WITNESSES AS WELL AS A FAILURE TO PRESENT AN EFFECTIVE CASE-IN-CHIEF RESULTED IN PREJUDICIAL ERROR AND INNEFFECTIVE [SIC] ASSISTANCE OF COUNSEL.

**{¶54}** Defense counsel did not interview a key, known witness prior to trial and did not present many of its own witnesses, thus Appellant argues that she received ineffective assistance of counsel. Despite the knowledge that Van Pelt would be a key witness for the state, defense counsel admittedly did not speak to him before trial. Appellant contends that this error is amplified by defense counsel's motion for a mistrial on the grounds that portions of Van Pelt's testimony were not disclosed to the defense. Appellant also argues that the prosecution's case-in-chief continued through the eighth day of trial while the defense case lasted less than two hours. Hence, Appellant urges that counsel's performance fell below the objective standard of reasonable representation, which prejudiced Appellant.

**{¶55}** The state argues in response that Appellant has not shown that counsel's performance was deficient. It is not unusual for a defense to be somewhat limited, as a defendant enjoys the presumption of innocence. The state argues that the fact that the defense case lasted less than two hours does not show deficient

performance. As the state faces the burden of proving that the defendant committed the crime, the state argues that it is common for the prosecution's case in chief to take more time. In addition, we note that defense counsel does not simply sit back during the presentation of the prosecution's case. Rather, counsel is actively working to attack the strength of the case against a defendant, and this record reflects such a defense.

**{¶56}** In regard to Van Pelt's testimony, the state argues that although counsel may not have interviewed him before trial, counsel was well prepared for cross-examination as both the testimony of Van Pelt and Stiffler lasted several hours and accounts for nearly 180 pages of trial transcript. Moreover, the state notes that defense counsel filed numerous evidentiary motions, requested a change of venue, and sought suppression of Appellant's statements, which reflects counsel's diligence.

**{¶57}** In order to prevail on an ineffective assistance of counsel claim, a defendant must meet the two-prong test of *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 205, 280 L.Ed.2d 674 (1984). Under the first prong, the defendant must show that counsel's performance fell below an objective standard of reasonable behavior. *Id.* at 687-688*.* Under the second prong, the defendant must show prejudice as a result of the deficient representation. *Id.* at 681-682*.* The second prong requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**{¶58}** The record establishes that defense counsel was well prepared for Van Pelt's cross-examination, which took up approximately 104 pages of trial transcript. While counsel may not have spoken to this witness before trial, we note that all of his statements were earlier provided to the defense. Thus, his testimony could not have been particularly surprising. Apparently, there was one instance where Van Pelt testified about a matter that the defense was not expecting and counsel requested a mistrial. Appellant has failed to provide details about which of Van Pelt's statements surprised the defense. Neither the parties nor the court expressly stated which statement was contested; however, a review of the record suggests that the testimony regards a statement that occurred just after the child's death. According to Van Pelt's testimony, Appellant told him that "she was going to prison for the rest of her life and that the cops or investigators thought it was her and that you guys were asking about my guns." (Tr. Vol. VI, p. 1269.) Appellant argued outside of the presence of the jury that this statement, which defense counsel characterized as a confession, was not contained within any of the written statements that were provided to the defense. The state responded by first arguing that the statement was not a confession and would not be presented as such. Regardless, the state argued that it had not seen or heard the statement before and it, too, was surprised.

**{¶59}** The trial court denied the motion for a mistrial and stated that the defense could cross-examine Van Pelt regarding the statement. Counsel did question Van Pelt twice regarding the statement and was able to procure testimony from him admitting that he had been untruthful during parts of the investigation.

There is no question that the resulting testimony from Van Pelt harmed his credibility, hence Appellant is unable to show prejudice resulting from his statement. Again, defense counsel's claim as to "surprise" was limited to this one instance and counsel had an opportunity to extensively cross-examine.

**{¶60}** Turning to the argument surrounding the length of each side's presentation, this case as a whole involved a limited amount of relevant witness testimony. Most of those witnesses were called by the state. As the state presents their case before the defense, there were few witnesses left for defense counsel to call who had not already testified. In fact, the majority of witnesses on the Appellant's pre-trial witness list were called by the state. The record demonstrates that defense counsel thoroughly cross-examined each of these witnesses.

**{¶61}** Accordingly, Appellant has not shown that counsel's performance fell below an objective standard of reasonable representation and she has not met the first prong of *Strickland*. Consequently, Appellant cannot meet the second prong. Accordingly, Appellant's fourth assignment of error is without merit and is overruled.

<u>Conclusion</u>

**{¶62}** As the majority of prospective jurors had no previous knowledge of the case and most of those who had heard of the case had limited information, the trial court did not abuse its discretion in denying Appellant's motion for a change of venue. Further, although the contested photographs could be considered gruesome, the record similarly demonstrates that the trial court did not abuse its discretion in admitting the hospital and funeral home photographs of the deceased child. The

record contains competent, credible evidence to support the jury's verdict, thus the verdict is not against the manifest weight of the evidence. Finally, Appellant has not met the standard set forth in *Strickland* and has not shown ineffective assistance of counsel. Accordingly, Appellant's assignments of error are without merit and the judgment of the trial court is affirmed.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.